[No. 71302-2. En Banc.]
Argued June 11, 2002. Decided December 12, 2002.

THE CITY OF SEATTLE, *Appellant*, v. FAWN ALLISON, *Respondent*.

---

[27] CP at 1335 (finding of fact 37).

[28] *See, e.g.*, CP at 1330-33, 1337-38 (findings of fact 7, 12, 15, 25, 63, 65).

*Thomas A. Carr, City Attorney,* and *Moses F. Garcia, Assistant,* for appellant.

*Stephen W. Hayne* (of *Hayne, Fox, Bowman & Duarte*) and *William K. Kirk* (of *The Cowan Law Firm*), for respondent.

*Timothy J. Donaldson* on behalf of the City of Walla Walla, amicus curiae.

MADSEN, J. — Three defendants who were charged with driving while intoxicated challenged the admission of BAC Verifier DataMaster II (DataMaster) breath-alcohol test results. The Seattle Municipal Court suppressed the breath test results in all three cases, holding that the information recorded on the breath test documents was insufficient to determine whether there was compliance with Washington Administrative Code (WAC) regulations. We hold that the breath test documents in these cases constitute prima facie evidence that the City of Seattle complied with former WAC 448-13-040 (1999) and thus satisfied the foundational requirements for admissibility of those documents at trial. Accordingly, we reverse the trial court's suppression order and remand for further proceedings.

## FACTS

On December 19, 2000, Fawn Allison was arrested for driving under the influence. The arresting officer, a certified operator of the DataMaster, conducted a breath test. Following the test, the DataMaster printed test result documents that showed Allison's blood alcohol level was above the legal limit. Allison was charged with driving while intoxicated. She moved to suppress the breath test results. The trial court consolidated her case with the others involved here. At the suppression hearing, the defendants offered transcripts of proceedings held in other jurisdictions involving accuracy of the thermometers used to measure the temperature of the simulator solution in the DataMaster breath testing machines. It is undisputed that the thermometers used in the DataMaster have a built-in variance of at least +/- 0.1 centigrade. In each case, the parties stipulated that the breath alcohol tests were properly ad-

ministered, that the operators who performed the breath tests observed that the DataMaster thermometer was within 0.2 degrees of 34 degrees centigrade, and that the results indicated blood alcohol levels above the legal limit.

Based on variances in the thermometers, the defendants argued that it is possible to have a reading that indicates the temperature of the simulator solution is within the range of 34 degrees +/- 0.2 degrees centigrade as required by former WAC 448-13-040 when the temperature is actually outside that range. They contended that without a recording of the actual temperature reading on the thermometer, which could be adjusted according to the known variance, it is impossible to establish whether the temperature is within the range set forth in former WAC 448-13-040.

The trial court agreed, reasoning that because the breath test documents do not record an actual temperature reading, and thermometers have built-in variances in accuracy, it is impossible for the city to establish a prima facie showing that the breath test documents meet the requirements of former WAC 448-13-040 and, therefore, can never establish the foundation necessary for admissibility. The trial court suppressed the breath test results. The city appealed and this court granted direct review.

## DISCUSSION

█ The foundational requirements for admissibility of breath test results were first established in State v. Baker, 56 Wn.2d 846, 852, 355 P.2d 806 (1960). In order to satisfy its initial burden to establish foundation, the prosecution must show that (1) the machine was properly checked and in proper working order at the time of the test, (2) the chemicals used were of the correct kind and proportion, (3) the subject had nothing in his mouth at the time of the test, and (4) the test was given by a qualified operator and in the proper manner. Id. at 852. Compliance with approved

breath test procedures is a condition precedent to admission of the test results. *Id.* Once the foundational requirements are established and the test results are admitted, a defendant may then attack the test results in a particular case by introducing evidence refuting the accuracy and reliability of the test reading. *State v. Straka*, 116 Wn.2d 859, 875, 810 P.2d 888 (1991).

When the DataMaster replaced the Breathalyzer machine, a similar set of foundational requirements was adopted, ultimately codified in chapter 448-12 WAC, the precursor to the current WAC regulations in chapter 448-13 WAC. The new machine, and its supporting protocols, was challenged and upheld in *State v. Ford*, 110 Wn.2d 827, 755 P.2d 806 (1988) and *Straka*, 116 Wn.2d 859.

The state toxicologist has the delegated authority to designate proper methods for performing the analysis of a person's blood or breath. RCW 46.61.506(3). In *Ford*, this court observed that "the Legislature has mandated that the analysis of breath or blood is valid if it is performed '*according to methods approved by the state toxicologist*'." *Ford*, 110 Wn.2d at 833 (quoting RCW 46.61.506(3)). "When the protocols . . . and existing Code provisions are followed, there is sufficient assurance of accuracy and reliability of the test results to allow for general admissibility of test results." *Straka*, 116 Wn.2d at 870.

The relevant procedures are found in several WAC provisions relating to the use and proper functioning of the DataMaster equipment. Former WAC 448-13-040 provides in part:

> The temperature of the solution in the simulator prior to the start of the test must be thirty-four degrees centigrade plus or minus 0.2 degrees centigrade. . . . The results of the test will be provided in the form of a printout on a breath test document.

The issue is whether the breath test documents printed by the DataMaster in these cases, which read "SIM TEMP 34c +/- .2c: YES", are sufficient to establish a foundation for admissibility of the test results under former WAC 448-13-

-040. The defendants' primary argument is that use of the word "be" in the WAC requires the city to prove the actual temperature of the simulator solution.

The city argues that the WAC requires the operator to determine only whether the temperature reading on the DataMaster machine is within the prescribed range and that evidence of thermometer variances bears upon the reliability of the test results in a particular case, and goes to weight, not admissibility of the evidence. Accordingly, the city argues that the test results were improperly suppressed.

 The meaning of a statute is a question of law and review is de novo. *State v. Breazeale*, 144 Wn.2d 829, 837, 31 P.3d 1155 (2001); *State v. J.M.*, 144 Wn.2d 472, 480, 28 P.3d 720 (2001). Rules of statutory construction apply to administrative rules and regulations. *State v. Burke*, 92 Wn.2d 474, 478, 598 P.2d 395 (1979). If a rule's meaning is plain on its face, then the court must give effect to that plain meaning. *J.M.*, 144 Wn.2d at 480. "Under the 'plain meaning' rule, examination of the statute in which the provision at issue is found, as well as related statutes or other provisions of the same act in which the provision is found, is appropriate as part of the determination whether a plain meaning can be ascertained." *Dep't of Ecology v. Campbell & Gwinn, L.L.C.*, 146 Wn.2d 1, 10, 43 P.3d 4 (2002); *C.J.C. v. Corp. of the Catholic Bishop of Yakima*, 138 Wn.2d 699, 708-09, 985 P.2d 262 (1999). A term in a regulation should not be read in isolation but rather within the context of the regulatory and statutory scheme as a whole. *ITT Rayonier, Inc. v. Dalman*, 122 Wn.2d 801, 807, 863 P.2d 64 (1993). The court should not construe a regulation in a manner that is strained or leads to absurd results. *Burke*, 92 Wn.2d at 478.

██ █ WAC 448-13-010 articulates the reasons for the rules governing breath testing: (1) to inform " 'the public of the administrative aspects of the state's breath alcohol test program' " and (2) *to practice those principles accepted in the scientific community. Walk v. Dep't of Licensing*, 95 Wn.

App. 653, 657, 976 P.2d 185 (1999) (quoting WAC 448-13-
-010). WAC 448-13-060 provides, in part, that:

> A [breath] test shall be a valid test and so certified, if the
> requirements of *WAC 448-13-040*, 448-13-050 and 448-13-055
> are met, and in addition the following criteria for precision and
> accuracy, as determined solely from the breath test document,
> are met:
>
> . . . .
>
> *If these criteria are met, then these and no other factors are*
> *necessary to indicate the proper working order of the instru-*
> *ment, and so certify it, at the time of the breath test.*

(Emphasis added.)

Taken together, the intent of these two rules is to pre-
scribe a method for administering a breath test that accords
with principles accepted in the scientific community and,
when followed, produces a valid test as evidenced by a
breath test document. Former WAC 448-13-040 sets forth
the particulars of the method selected by the toxicologist for
administering the breath test on the DataMaster. In the
first sentence, the rule provides that "[t]he following
method for performing a breath test is approved by the
state toxicologist pursuant to WAC 448-13-130." Former
WAC 448-13-040. The rule then lists several steps that an
operator must follow in administering the DataMaster test.
First, the operator must determine that the person tested
does not vomit, smoke, or consume food or drink for at least
15 minutes prior to the test. At the beginning of the waiting
period, the operator must examine the subject's mouth to
ensure that it contains no foreign substances, including
jewelry. Next, the rule provides that, prior to the start of the
test, the temperature of the simulator solution must be
within the prescribed range. It then directs that at least two
valid breath samples must be provided by the subject.
Finally, the rule directs that the results of the test must be
provided in the form of a printout on a breath test docu-
ment.

■ Read in context, the language at issue in former WAC
448-13-040 is a directive to the DataMaster operator to

observe whether the temperature of the simulator solution is 34 degrees centigrade plus or minus 0.2 degrees centigrade. If the thermometer registers a temperature within that range, the operator may obtain a subject's breath sample. The rule does not require the operator to ascertain the actual temperature of the simulator solution. This makes sense since the DataMaster does not record actual temperature. Rather, when the operator observes a temperature within the prescribed range, he or she may proceed with the test when the machine records "SIM TEMP 34c +/- .2c: YES" on the breath test document. Contrary to defendants' position, the rule does not require, nor provide a method for, determining the actual temperature or the accuracy of the thermometer. Nor does the actual operation of the machine lend itself to such a regulation.

If we accepted the defendants' interpretation of former WAC 448-13-040 the breath test results would be inadmissible in every case, unless, as the defendants suggest, an operator additionally records the actual temperature reading and then, using the thermometer variance of +/- 0.1, calculates whether the actual temperature falls within the rule's range. We do not believe that the toxicologist intended to promulgate a rule containing requirements that are beyond the performance abilities of the machine or that require an operator to take steps that are not included in the rule. Accordingly, we conclude that compliance with former WAC 448-13-040 requires only that the breath test ticket reflect that the temperature was within the specified range. This construction is consistent with the language and purpose of the rule, which is to set forth the steps that must be followed to obtain a valid test, as well as with the actual operation of the machine.

The defendants argue, though, that 2001 amendments to WAC 448-13-040 support a conclusion that the toxicologist must have intended that the simulator solution temperature be exactly 34 degrees centigrade plus or minus 0.2 degrees centigrade to produce a valid test result under the former regulation. In an emergency rule-making order

amending WAC 448-13-040, the state toxicologist specifically changed the temperature range for the simulator solution to 34 degrees centigrade plus or minus 0.3 degrees to account for the 0.1 degree variance built into the thermometers.[1] In issuing the order, the state toxicologist wrote:

> Judges in Renton District Court and Bellevue Municipal Court have ruled that the thermometers used in the simulators on breath test instruments do not have sufficient accuracy to meet the existing WAC standard of thirty-four degrees plus or minus 0.2 degrees centigrade, which impacts the admissibility of the breath test result. Other courts may follow suit. *All parties have stipulated that the limitations of the thermometers do not affect the accuracy of the results of the breath test.*
>
> In light of the ruling from Renton, the acceptable variance specified in the WAC for the temperature of the simulator at the time of the test is being expanded to be plus or minus 0.3 degrees centigrade. This permits the continued use of the current instrument standard of plus or minus 0.2 degrees centigrade at the time of the test, and recognizes the limits of accuracy of the thermometer. An additional provision requires the thermometers to be certified at least annually.
>
> These provisions are intended to address the concerns of the courts on the admissibility of breath alcohol test results, and to permit all future tests to be considered as evidence provided they meet these and the existing requirements of the administrative code.

Proposed Rules to WAC 448-13-040, St. Reg. 01-11-134 (May 23, 2001) (emphasis added).

In response to two comments received regarding the adoption of the new rule, the state toxicologist explained further:

> *Question*: Why was the acceptable range for the thermometer

---

[1] The amended WAC 448-13-040 now requires:

Prior to the start of the test the operator must verify that the thermometer, certified per WAC 448-13-035, indicates that the temperature of the simulator solution is thirty-four degrees centigrade plus or minus 0.3 degrees centigrade.

reading not changed to 34 degrees plus or minus 0.1 degrees instead of 0.3 degrees?

*Response*: This question reflects a misunderstanding of the issue ruled on by judges in Renton and Bellevue district courts in King County. These courts found that there was no explicit recognition in the WAC of the limits of accuracy of the mercury in glass thermometers used in the breath test equipment, and that thus, any variability in the thermometer must be included within the acceptable range. By enlarging the acceptable range to 0.3 degrees centigrade, but continuing to require a thermometer reading of 34 degrees plus or minus 0.2 degrees in the operation of the program, the potential variance in the thermometer is explicitly recognized and allowed for. Changing this allowable range does not introduce any additional inaccuracy into the measurement of the subject's breath alcohol concentration.[2]

*Id.* at ex. 5 (Permanent Rule Adoption for WAC 448-13-040, St. Reg. 01-17-009 (Aug. 2, 2001)).

The language of the amendment and the order do not support the defendants' construction. As the toxicologist's order states, his decision to amend the rule to account for the variation in thermometers was based on the decisions of two courts that any variation had to be included within the rules. His expressed concern was that other courts might make similar rulings. As his response to questions makes clear, the amendment changing the temperature range to expressly recognize thermometer variances does not change the requirement that the temperature fall within the range of 34 degrees centigrade plus or minus 0.2 degrees centigrade. The amendment does not undercut reliability of the test under the former rule.

Finally, the defendants' construction is not necessary to ensure accuracy or reliability for the purpose of general admissibility. In *Baker* the officers waited 14 minutes before administering a breath test. This court held that the

---

[2] The emergency order postdated the tests in this case and neither party argues for its application to these cases.

foundation for admissibility was not met because the WAC requires a 15-minute waiting period and literature from experts in the field established that the 15-minute waiting period is necessary to give an accurate measure of the concentration of alcohol in the blood. *Baker*, 56 Wn.2d at 856. Similarly, in *Ford*, 110 Wn.2d at 833, and *Straka*, 116 Wn.2d at 870-71, this court emphasized that the purpose of requiring compliance with the regulations is to assure accuracy and reliability of the test results for general admissibility. In this case, the 2001 amendment to WAC 448-13-040 and the accompanying emergency order indicate that the toxicologist did not believe minor variations in the machine's thermometer affect the accuracy or reliability of the test results.

Based on the language of former WAC 448-13-040, we hold that the breath test documents in these cases constitute a sufficient foundation for admissibility of the test results and arguments as to reliability of the particular test results are questions for the jury. *Straka*, 116 Wn.2d at 875; *see State v. Watson*, 51 Wn. App. 947, 951, 756 P.2d 177 (1988) ("once the [breath test] evidence is rendered admissible by demonstrating compliance with administrative regulations, the defendant may attack the machine's reliability by presenting evidence to the jury") (citing *State v. Franco*, 96 Wn.2d 816, 639 P.2d 1320 (1982); *City of Bremerton v. Osborne*, 66 Wn.2d 281, 401 P.2d 973 (1965)).

The trial court's order suppressing breath test results is reversed and the cases are remanded for further proceedings.

ALEXANDER, C.J., and SMITH, IRELAND, BRIDGE, and OWENS, JJ., concur.

SANDERS, J. (dissenting) — The majority rejects the municipal court's interpretation of former WAC 448-13-040

(1999)[3] on the false assumption that the BAC Verifier DataMaster (DataMaster) is incapable of recording the temperature of the simulator solution with the accuracy required by a literal reading of the regulation. Majority at 83. But the DataMaster does not measure the temperature of the simulator solution, it merely prompts the operator to confirm whether the temperature of the simulator solution falls within the regulatory range of 34 degrees centigrade plus or minus 0.2 degrees centigrade.[4] Clerk's Papers (CP) at 139 (testimony of Sergeant Gullberg);[5] *see also id*. at 214 (DataMaster operator information manual); *id*. at 537 (Mem. Op. of Seattle Mun. Ct.). To answer that question accurately, the operator needs to take into account the thermometer's instrumental error. *Id*. at 131 (testimony of breath test technician, Trooper Brian Bowers).

As part of the procedure for administering a breath test required by the Washington Administrative Code, a solution of ethanol and water contained in a canister attached to each DataMaster is tested between a DUI (driving under the influence) suspect's breath samples as a means of verifying that the DataMaster is in proper working order. WAC 448-13-030(8), (22); -050. When heated to 34 degrees centigrade, plus or minus 0.2 degrees centigrade, the solution produces a vapor with a predictable, known alcohol concentration value. WAC 448-13-030(16). By demonstrating its ability to accurately test a known solution at a specified temperature, the operator verifies that the Data-Master is in proper working order. CP at 139 (testimony of Sergeant Gullberg). The temperature is critical because the

---

[3] Former WAC 448-13-040 (1999) was amended by emergency rule on April 20, 2001. The emergency provision was extended on July 17, 2001, and adopted as a permanent rule on August 2, 2001.

[4] The BAC DataMaster merely records the operator's response; it has no internal mechanism to validate the accuracy of the operator's response. Clerk's Papers (CP) at 139 (testimony of Sergeant Gullberg, Washington State Patrol, assigned to the Seattle breath alcohol test section); *id*. at 175 (testimony of Anthony McElroy, breath alcohol consultant).

[5] The city stipulated to the admission of the testimony of Sergeant Gullberg, Trooper Brian Bowers, and others in the hearings before the Renton District Court as evidence of prior sworn testimony. CP at 388.

device relies on Henry's law, an accepted law of physics that holds alcohol molecules will evaporate from a known solution at a predictable rate when heated to a specific temperature. *Id.*

*Department of Licensing v. Cannon*, 147 Wn.2d 41, 50 P.3d 627 (2002) holds the party seeking to admit the result of a breath test must first prove compliance with all the relevant procedural safeguards established by the state toxicologist. *Cannon* affirmed the suppression of the results of a breath test because the State failed to prove the thermometer used in the test had been certified as accurate within plus or minus 0.1 degree centigrade pursuant to WAC 448-13-035. Substantial compliance with the regulations is insufficient. *See State v. Baker*, 56 Wn.2d 846, 856, 355 P.2d 806 (1960) ("Thus, under the state's own evidence, appellant may have been given the test after having been under observation for only fourteen minutes. Although this is only one minute less than the required fifteen-minute minimum, the state is bound by its own evidence to the effect that the minimum period of delay must be *fifteen* minutes.").

Former WAC 448-13-040 mandates:

> The temperature of the solution in the simulator prior to the start of the test *must be* thirty-four degrees centigrade plus or minus 0.2 degrees centigrade.

(Emphasis added.) The admission of the defendants' breath tests depends on the city's proof that the temperature of the solution prior to the start of the test was in fact 34 degrees centigrade plus or minus 0.2 degrees centigrade.

The municipal court found the thermometers attached to the simulator solution in Allison's and Wendy Sampson's cases had a variance of plus or minus 0.1 degree centigrade as compared to the State's reference thermometer, while the thermometer attached to the simulator solution in Mario Hernandez's case had a variance greater than 0.2 degrees centigrade. CP at 530. Unchallenged facts become verities on appeal. *State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 313 (1994).

Therefore, for the trial court to admit the test results for Allison and Sampson, the city needed to prove the actual measured temperature of the solution fell within the range of 33.9 to 34.1 degrees centigrade to allow for the potential 0.1 degree variance. However, the city submitted no evidence of the actual temperature the operator observed. Moreover, because the variance of the thermometer used to obtain Hernandez's test results exceeded 0.2 degrees centigrade, the city could not have proved compliance with former WAC 448-13-040 in Hernandez's case *at any measured temperature*. To allow the city to admit breath tests under the facts of these cases directly contradicts *Cannon* and *Baker*.

For these reasons, I respectfully dissent.

JOHNSON, J., concurs with SANDERS, J.

CHAMBERS, J. (concurring in dissent) — I concur completely with Justice Sanders' well reasoned dissent. I write separately only to more fully express my concern at the potential sweep of the lax approach the State would have us take to foundational requirements we have repeatedly instructed are strict and mandatory. When trial is effectively by machine, due process requires at the least assurances that the machine is accurate. Here, the State established by regulations promulgated by the State's own toxicologist procedures to assure the accuracy of the machine. It failed to follow these procedures. The core of the majority's reasoning is a belief some of these procedures are less equal than others and that a machine may confidently self-certify its own accuracy. The majority's reasoning is circular because it is the very ability of the machine to accurately measure its own accuracy which is in question. I concur with the courts below and would hew to our prior holdings and rule that when the State establishes procedures to assure the accuracy of the BAC Verifer DataMaster II (DataMaster), the public is entitled to expect that the government will follow those procedures. *Cf. State v. Ford*, 110 Wn.2d 827, 833, 755 P.2d 806 (1988).

Guilt or innocence of the offenses here charged is often determined by a machine. By statute, the State has been relieved of the burden of showing intent, including knowledge. Further, the State does not always need to show intoxication. The government must merely show that within two hours of operating a motor vehicle, the accused had a blood alcohol reading on the DataMaster II machine of .08 or greater.[6] Effectively, loss of liberty and property is determined by the measurement by a machine. Both our state and federal constitutions require that a person may not be deprived of liberty or property without due process of law. While a carefully managed and tended machine may be a useful tool for guarding due process, the credibility of the machine must be carefully monitored. In order for the government to impose strict liability based upon the measurement by a machine, the machine must be accurate. When the State seeks to impose strict liability based upon the measurement by a machine, properly promulgated regulations must be carefully followed. *Ford*, 110 Wn.2d 827; *cf. State v. Baker*, 56 Wn.2d 846, 852, 355 P.2d 806 (1960).

Compliance with former WAC 448-13-060 (1999) is an absolute foundational requirement for admissibility of test results. *See State v. Cannon*, 147 Wn.2d 41, 58, 50 P.3d 627 (2002); *cf. State v. Straka*, 116 Wn.2d 859, 810 P.2d 888 (1991). Fawn Allison challenges the foundational requirements were not met because the State did not establish that a "valid" test was performed under former WAC 448-13-040 (1999). She should prevail. A valid test requires a temperature reading within a certain range, and it is undisputed that many thermometers used to measure the temperature in BAC DataMasters were inaccurate at the time. As Justice Sanders aptly notes, temperature is critical because the DataMaster II relies on the known properties of solutions at specific temperatures. If the temperature does not

---

[6] While the accused have the right to have a blood alcohol test drawn at a hospital at their own expense, very few avail themselves of this right. As a practical matter, the DataMaster II determines guilt or innocence in the vast majority of cases.

actually fall within the appropriate range, at the very least the accuracy of the machine's own certification is put into question.

I recognize that the majority's holding is limited, and under the rule announced today, the DataMaster's self-certification constitutes only prima facie rebuttable evidence of compliance with the admissibility requirements of former WAC 448-13-040. But effectively, the DataMaster's evidence is the only evidence. Where the measurement by a machine effectively creates a mandatory and conclusive finding of guilt, we should not be satisfied by shifting the burden to the accused to prove the inaccuracy of the machine. The machine is owned, controlled, maintained, and certified by the State. It should be the duty of the State to affirmatively prove the accuracy of the machine, and the State's affirmative duty should include satisfying its burden to prove that all procedural requirements to establish the accuracy of the machine have been satisfied. *See, e.g., Ford*, 110 Wn.2d 827.

I concur with the dissent on all points, and would affirm the municipal court's suppression of the breath tests in all three cases.

Reconsideration denied January 31, 2003.