174 P.3d 43 (2007)
Mark LUDVIGSEN, Petitioner,
v.
CITY OF SEATTLE, Respondent.
No. 79974-1.
Supreme Court of Washington, En Banc.
Argued June 12, 2007.
Decided December 20, 2007.
*44 Elizabeth Anne Padula, Padula & Associates LLC, Theodore Wayne Vosk, Law Offices of Vosk & Velasquez, Bellevue, WA, for Petitioner.
Moses Flint Garcia, Stafford Frey Cooper, Seattle, WA, for Respondent.
CHAMBERS, J.
¶ 1 In 2002, Mark Ludvigsen was arrested on suspicion of driving while intoxicated. At that time, if the city of Seattle (City) wanted to convict Ludvigsen under the "per se" prong of its former driving while intoxicated ordinance,[1] it had to prove Ludvigsen failed a valid breath test. The breath testing machine compares the amount of alcohol vapor in a known sample with the alcohol vapor in a breath sample at a known temperature. In 2002, to establish that the test was valid, the government had to prove that the test machine's thermometer had been certified by a thermometer traceable to National Institute of Standards and Testing (NIST) standards.[2] Because of a 2004 amendment, the government no longer obligates itself to prove that the test thermometer is certified.[3] With respect to the per se prong of the driving under the influence (DUI) statute, RCW 46.61.502, the change is more than a mere change in what evidence the jury will or will not hear; it reduces the quantum of evidence necessary to establish a prima facie case that overcomes the presumption of innocence. We hold retroactive application of the amendment violates the ex post facto clause of the U.S. CONST. art. I, § 10, and reverse.

I
¶ 2 Ludvigsen submitted to a breath test on February 5, 2002. He registered a 0.23 reading on the breath test and was charged *45 with driving while intoxicated (DWI) under former Seattle Municipal Code (SMC) 11.56.020 (2002).[4] However, Ludvigsen did not go to trial in 2002. Ludvigsen skipped his arraignment and did not come to trial until 2005. By the time of the evidentiary hearing to determine the admissibility of the breath test, the relevant portions of the SMC and the WAC had changed. The changes were likely precipitated by this court's decision in City of Seattle v. Clark-Munoz, 152 Wash.2d 39, 93 P.3d 141 (2004).
¶ 3 In Clark-Munoz, we considered the admissibility of breath tests used in Washington. In Washington, the state toxicologist promulgates standards for determining the known temperature of an alcohol vapor sample and, at the time of the Clark-Munoz decision, those standards required that the thermometer used in the breath test be certified by using a reference thermometer traceable to standards maintained by the NIST. See former WAC 448-13-035 (1991). In the Clark-Munoz cases, the State had not established at trial that the breath testing machines used on the defendants were tested on thermometers traceable to standards maintained by NIST and therefore could not establish that the thermometers were properly certified under former WAC 448-13-035. Clark-Munoz, 152 Wash.2d at 48, 93 P.3d 141. Holding that the State must abide by its own rules, especially when applied to vital privileges like driving, we held the breath tests were inadmissible. Id. at 50, 93 P.3d 141.
¶ 4 Following our opinion in Clark-Munoz, the state toxicologist repealed chapter 448-13 WAC and with it the requirement that certifying thermometers comply with NIST standards. In its place is now chapter 448-16 WAC, which does not require a certifying thermometer be traceable to NIST standards.[5]
¶ 5 When Ludvigsen was arrested in 2002, the municipal code in effect established that a driver was guilty of a DWI if "the person has . . . an alcohol concentration of 0.08 or higher, as shown by analysis of the person's breath or blood made under the provisions of this section." Former SMC 11.56.020(A)(1)(a) (2002) (emphasis added). The "provision," referenced in subsection A, was found in subsection J, titled "Methods of Analysis." It read:
Analysis of the person's blood or breath to be considered valid under the provisions of this section shall have been performed according to methods approved by the State Toxicologist and by an individual possessing a valid permit issued by the State Toxicologist for this purpose.
Former SMC 11.56.020(J) (2002). However, in 2004, paralleling what happened at the state level, former SMC 11.56.020(A)(1)(a) (2002) was changed and no longer requires that analysis of breath or blood establishing a blood alcohol level of 0.08 comply with "the provisions of this section." Instead, a blood alcohol level of 0.08 must be "shown by analysis of the person's breath or blood made under RCW 46.61.506." SMC 11.56.020(A)(1)(a).
¶ 6 The amendment to the SMC may be largely illusory. Under both the prior and amended versions, the relevant authority for purposes of breath test analysis is the WAC. The amendment to the SMC merely altered the route to the WAC. Compliance with RCW 46.61.506(3), required under the current SMC, is the same as compliance with the provisions of the municipal code, required under the 2002 SMC, to the extent both defer to the regulations promulgated by the state toxicologist. RCW 46.61.506(3) and SMC 11.56.020(J) use the same language.[6] *46 In both cases, the "methods approved by the State Toxicologist" govern. Compare former SMC 11.56.020(A)(1)(a) (2002) with SMC 11.56.020(A)(1)(a) (2004) and RCW 46.61.506(3). Thus, the relevant change for the purposes of Ludvigsen's appeal was the state toxicologist's amendments to the WAC.
¶ 7 To summarize, in 2002, when Ludvigsen was arrested, voluntarily gave his breath sample, and was charged with DWI,[7] the law required that the test machine be certified with a thermometer traceable to the NIST standards. See former WAC 448-13-035. Following our opinion in Clark-Munoz, the NIST traceability requirement was repealed. See chapter 448-16 WAC. In 2004, the law changed and a breath test that would have been invalid for lack of a test thermometer traceable to the NIST, at least from that point on, became valid under relevant statutes, regulations, and ordinances.
¶ 8 Both parties agree that Ludvigsen's 2002 breath test was substantially similar to those considered in Clark-Munoz and that "traceablity to NIST standards" could not be established. Had Ludvigsen's trial occurred in 2002, that is to say subject to the regulations in force in 2002, the breath tests should have been excluded as inadmissible for failing to comply with the WAC regulations in effect at the time. See Clark-Munoz, 152 Wash.2d at 50, 93 P.3d 141. However, Ludvigsen did not go to trial until 2005, after the statutory and administrative meaning of a valid test changed.
¶ 9 At his 2005 trial, Ludvigsen moved to suppress the results of the breath test he took in 2002. He argued the admissibility of the test was governed by former chapter 448-13 WAC, the regulation in effect at the time of his arrest and, thus, by Clark-Munoz. The preliminary and ultimately dispositive issue before the trial judge was whether the 2002 or the current law would govern the hearing. The answer, the parties argued and the judge agreed, depended on whether the amendments affected procedural or substantive law.[8] The trial judge found that the amendments were substantive and not procedural and, thus, not retroactive.
¶ 10 The City appealed to the superior court. The superior court reversed, concluding that RCW 46.61.506(3) and chapter 448-16 WAC are procedural in nature and therefore are presumed to apply retroactively. Ludvigsen successfully moved for discretionary *47 review, and pursuant to RAP 4.4, his case was transferred to this court.

II
¶ 11 There are two initial questions. We must decide whether the legislature intended the amendment to have retroactive effect. In re F.D. Processing, 119 Wash.2d 452, 460, 832 P.2d 1303 (1992). We must also decide whether retroactivity is even at issue. "`"A statute does not operate `retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment . . . or upsets expectations based on prior law."'" State v. T.K., 139 Wash.2d 320, 330, 987 P.2d 63 (1999) (quoting Landgraf v. USI Film Prods., 511 U.S. 244, 269, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (quoting Republic Nat'l Bank v. United States, 506 U.S. 80, 100, 113 S.Ct. 554, 121 L.Ed.2d 474 (1992))). A statute operates prospectively "when the precipitating event for its application occurs after the effective date of the statute." T.K., 139 Wash.2d at 329-30, 987 P.2d 63 (citing Aetna Life Ins. Co. v. Wash. Life & Disability Ins. Guar. Ass'n, 83 Wash.2d 523, 535, 520 P.2d 162 (1974)). Both of these preliminary questions turn on the intent of the legislature. Id at 329, 987 P.2d 63.
¶ 12 Ludvigsen does not challenge the superior court's statutory interpretation. Instead, Ludvigsen argues the ex post facto clause prohibits applying the 2004 amendments to a trial of his alleged 2002 crime. We presume statutes are constitutional and review challenges to them de novo. State v. Shultz, 138 Wash.2d 638, 642-43, 980 P.2d 1265 (1999) (citing State ex rel. Pub. Disclosure Comm'n v. 119 Vote No! Comm., 135 Wash.2d 618, 623, 957 P.2d 691 (1998)).
¶ 13 The United States Constitution declares that "[n]o State shall . . . pass any . . . ex post facto law." U.S. CONST. art. I, § 10. The Washington State Constitution similarly declares that "[n]o . . . ex post facto law . . . shall ever be passed." CONST. art. I, § 23. These provisions employ the same framework adopted from the 1798 case of Calder v. Bull, 3 U.S. (3 Dall.) 386, 1 L.Ed. 648 (1798). See State v. Edwards, 104 Wash.2d 63, 70-71, 701 P.2d 508 (1985) (citing Calder, 3 U.S. (3 Dall.) 386, 1 L.Ed. 648); see also State v. Handran, 113 Wash.2d 11, 14, 775 P.2d 453 (1989). The United States Supreme Court has "repeatedly endorsed" the Calder framework. Carmell v. Texas, 529 U.S. 513, 525, 120 S.Ct. 1620, 146 L.Ed.2d 577 (2000) (collecting cases). The Calder framework divides ex post facto laws into four categories:
1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2d. Every law that aggravates a crime, or makes it greater than it was, when committed. 3d. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender.
Calder, 3 U.S. (3 Dall.) at 390. The fourth category, Ludvigsen argues, is at issue in this case. The United States Supreme Court in Carmell explored this category in depth. There Justice Stevens explained that the paradigmatic example of the fourth category was the case of Sir John Fenwick. Carmell, 529 U.S. at 526, 120 S.Ct. 1620. The case was cited by Justice Chase, author of Calder, and by a leading scholar on the English common law Richard Wooddeson, whose treatise Chase relied on. Id. at 526, 522, 120 S.Ct. 1620.
¶ 14 Sir John Fenwick conspired with a group of Jacobin loyalists who sought to overthrow King William III of England. Id. at 526, 120 S.Ct. 1620 (citing 9 Thomas Macaulay, History of England 31-32 (1899)). Several members of this conspiracy revealed the plan to King William who had the alleged plotters, including Fenwick, arrested. Id. (citing 9 Macaulay, supra, at 122-25). Only two witnesses had sufficient knowledge of Fenwick's involvement to testify against him. Id. (citing 9 Macaulay, supra, at 170-71). At the time, by law a British subject could not be convicted of high treason without two witnesses. Id. at 526-27, 120 S.Ct. 1620 *48 (citing An Act for Regulateing of Tryals in Cases of Treason and Misprision of Treason, 7 & 8 Will. III, ch. 3, § 2 (1695-1696), in 7 Statutes of the Realm 6 (reprint 1963)). Fenwick, or rather the blade of Fenwick's agent, convinced one of the witnesses to flee to France and thus he was not available to testify. Id. at 528 n. 16, 120 S.Ct. 1620 (citing 9 Macaulay, supra, at 194-95).
¶ 15 The Crown was left with only one prosecution witness. The House of Commons passed a law repealing the two-witness rule. Fenwick was convicted and beheaded. Id. at 529, 120 S.Ct. 1620 (citing 9 Macaulay, supra, at 214-27; An Act to Attaint Sir John Fenwick Baronet of High Treason, 8 Will. III., ch. 4 (1696)). The new law, Chase and Wooddeson observed, exemplified the fourth category of ex post facto laws. Id. at 526, 120 S.Ct. 1620. The amended law altered the required evidence necessary to convict Fenwick. The law did not invent a new crime, nor enhance the punishment for an existing crime, but was nevertheless an ex post facto law because it reduced the quantum of evidence the State needed to present to sustain a conviction.
¶ 16 The United States Supreme Court found a modern example of the fourth category in Carmell. Carmell sexually abused his stepdaughter for many years. Carmell, 529 U.S. at 516, 120 S.Ct. 1620. Carmell's criminal conduct occurred when under Texas law a defendant could not be convicted of sexual assault based solely on the victim's testimony, unless the victim reported the crime within six months. Id. at 517, 120 S.Ct. 1620 (quoting Tex.Crim. Proc.Code Ann., art. 38.07 (Vernon 1983)). However, a conviction could be based solely on such a victim's testimony if the victim was under 14 years of age. In 4 of the 15 separate counts, the victim was both over 14 and silent for more than the statutory six months. Id. at 519, 120 S.Ct. 1620.
¶ 17 Between the offense and trial, the Texas legislature amended the exception to the six month outcry rule, extending it to all victims under the age of 18. Id. at 518, 120 S.Ct. 1620. The only evidence against Carmell was the testimony of the victim. Id. at 519, 120 S.Ct. 1620. The trial court applied the more recent law permitting Carmell's conviction based solely on the victim's testimony. Had the court applied the former law, Carmell could not have been convicted because the victim's testimony was legally insufficient to support a conviction under the statute. Id. The Supreme Court held that the amendments could not be applied to offenses committed before their effective date without violating the ex post facto clause. Id. at 552, 120 S.Ct. 1620. The Court observed that "the circumstances of petitioner's case parallel those of Fenwick's case 300 years earlier . . . Texas' retrospective application of the amendment . . . permitted petitioner to be convicted with less than the previously required quantum of evidence." Id. at 530-31, 120 S.Ct. 1620.
¶ 18 In Ludvigsen's case, whether applying the post Clark-Munoz change to the law violates the ex post facto clause depends largely on how the change to the law is characterized. If it is characterized as a procedural change in the admissibility of evidence, it does not violate the ex post facto clause. If it is characterized as a substantive change in the amount of evidence necessary to support a conviction, then it violates the ex post facto clause.
¶ 19 Ordinary rules of evidence are procedural and neutral. Though in some cases the State may benefit from a change in evidence law, such changes are not inherently beneficial to the State. But rules reducing the evidence required to make a prima facie case are substantive and inherently disadvantage the defendant by permitting a conviction based on less evidence than was previously required. Carmell, 529 U.S. at 533 n. 23, 120 S.Ct. 1620 ("We do not mean to say that every rule that has an effect on whether a defendant can be convicted implicates the Ex Post Facto Clause. Ordinary rules of evidence, for example, do not violate the Clause.").
¶ 20 The difference between "ordinary" rules of evidence and the alterations in the rules of evidence that Justice Chase spoke of in his "4th category" is their impact on the sufficiency of evidence necessary to convict. Justice Stevens explained that "ordinary" rules of evidence do not implicate ex post *49 facto concerns because "they do not concern whether the admissible evidence is sufficient to overcome the presumption [of innocence]." Id. Thus, the issue is whether the WAC amendments changed ordinary rules of evidence or changed the evidence necessary to convict Ludvigsen of a DWI.
¶ 21 In Clark-Munoz, we explained that a violation of RCW 46.61.502[9] may be proved in two different ways: through the per se method, which requires the State to show the defendant's blood alcohol level was at least 0.08 based upon a valid breath test within two hours after driving, or through "other evidence," (typically testimony) that requires the State to prove that the defendant was impaired by alcohol or drugs. Clark-Munoz, 152 Wash.2d at 44, 93 P.3d 141 (citing RCW 46.61.502; 13A SETH A. FINE & DOUGLAS J. ENDE, WASHINGTON PRACTICE: CRIMINAL LAW § 804, at 148 (2d ed.1998)). The general crime is DWI, but driving with a specified alcohol level, as proved by a breath test, is per se under the influence. If the question before us was the admissibility of some other evidence under the "other evidence" prong, it would likely be procedural. But under the per se prong, the validity of the breath test is a part of the prima facie case the government must prove.[10] The City redefined the meaning of a valid test and thereby changed the meaning of the crime itself.[11] In 2002, a person driving in the city of Seattle was guilty of DWI if the person had "within two (2) hours after driving, an alcohol concentration of 0.08 or higher, as shown by analysis of the person's breath or blood made under the provisions of this section." Former SMC 11.56.020(A)(1)(a) (emphasis added). The "provisions of this section" lead us directly to "methods approved by the state toxicologist." SMC 11.56.020(J). Those approved methods required that every breath testing machine be tested with a thermometer traceable to NIST standards. See former WAC 448-13-035.
¶ 22 In 2002, to prove a violation under subsection (A)(1)(a), the City was required to show that the defendant drove a vehicle and, within two hours, took a breath test showing a 0.08 alcohol level. To do this, the City had to prove the test was on a valid breath testing machine. See Clark-Munoz, 152 Wash.2d at 44, 93 P.3d 141. To prove the test was valid, the City had to prove compliance with "the provisions of this section," i.e., the methods approved by the state toxicologist in the WAC. Former SMC 11.56.020(A)(1)(a), (J) (2002). The subsequent change reduced the quantum of evidence to establish a prima facie case and to overcome the presumption of innocence.
¶ 23 The City responds that even if applying amended procedures violates the ex post facto clause, the breath test evidence is not conclusive, and that the City and Ludvigsen may still debate before the jury the reliability of the uncertified breath test. That is hardly solace to Ludvigsen and does not remedy the ex post facto violation. Ludvigsen may argue to the jury that breath tests are more reliable if certified, but such a case under the 2002 laws would not have even gone to trial. He was entitled to a dismissal. Sir Fenwick may have been able to argue that two witnesses are more reliable than one, but the offense to the ex post facto clause derives from denying Fenwick the dismissal the law demanded before the law was amended. Ludvigsen was entitled to a dismissal because the City failed to overcome its own requirement for evidence sufficient to convict. The City may not, after the fact, change the requirement.
*50 ¶ 24 The City also responds that the amendments did no more than expand the scope of admissible evidence. Relying on Hopt v. Territory of Utah, 110 U.S. 574, 589, 4 S.Ct. 202, 28 L.Ed. 262 (1884), the City suggests the amendments are, quoting Hopt, akin to statutes that "simply enlarge the class of persons who may be competent to testify in criminal cases." We disagree with this characterization. While it is true the amendments govern the admissibility of evidence, of greater significance is what they take away. See City of Fircrest v. Jensen, 158 Wash.2d 384, 396-97, 143 P.3d 776 (2006) (describing the effect of the amendments on the admissions procedure). Before the amendments, defendants could not be prosecuted, as a matter of law, based solely on evidence from a breath test that was not certified. Now they can. See id. This is not a mere change in evidence law. The amendments do not simply let more evidence in to trial; they change the quantum of evidence necessary to support a conviction.
¶ 25 We conclude the application of the 2004 DWI amendments, redefining a "valid" test, to Ludvigsen's 2002 criminal conduct violates the ex post facto clause. The 2002 definition, found in former chapter 448-13 WAC, governs. See Clark-Munoz, 152 Wash.2d at 48, 93 P.3d 141 (explaining operative effect of the definition).[12] Having reached this conclusion, we find it unnecessary to reach the remainder of Ludvigsen's arguments.

III
¶ 26 The 2004 amendments lower the quantum of evidence necessary to convict Ludvigsen in violation of the ex post facto clause. We reverse the superior court and remand for proceedings consistent with this opinion.
WE CONCUR: GERRY L. ALEXANDER, C.J., CHARLES W. JOHNSON, RICHARD B. SANDERS, BOBBE J. BRIDGE, SUSAN OWENS, MARY E. FAIRHURST, JAMES M. JOHNSON, JJ.
MADSEN, J. (concurring).
¶ 27 I agree with the majority that the regulations in effect at the time of Ludvigsen's breath test apply in determining its validity. This result is compelled by a plain reading of the statute, which provides a breath test "shall have been performed according to methods approved by the state toxicologist." RCW 46.61.506(3) (emphasis added).[1] The statute plainly indicates the legislature intends breath tests to be performed in accordance with methods approved at the time of the test, not later.[2] At the time Ludvigsen was given his breath test, the National Institute of Standards and Testing (NIST) traceability requirement was part of the regulation defining a valid breath test. Former WAC 448-13-035, -040 (2001); Cannon v. Dep't of Licensing, 147 Wash.2d 41, 58, 50 P.3d 627 (2002) (interpreting 2001 amendment to approved breath test procedures); City of Seattle v. Clark-Munoz, 152 Wash.2d 39, 50, 93 P.3d 141 (2004) (same). Following our decisions in Cannon and Clark-Munoz, Ludvigsen's breath test is invalid as a matter of law due to the State's failure to comply with the NIST traceability requirement. Thus, I concur in the result.
¶ 28 I write separately to observe the result in Clark-Munoz, and here, was compelled by the unusual circumstance that the toxicologist incorporated the NIST traceability requirement into the regulation defining a valid breath test. The insertion of the NIST traceability requirement was unusual in that, previously, the regulation defining a valid *51 test pertained only to standards that must be met during the actual administration of the test, and did not include tangential machine maintenance procedures. See City of Seattle v. Allison, 148 Wash.2d 75, 83, 59 P.3d 85 (2002) (discussing foundational requirements under former regulations). Once the NIST traceability requirement became part of the regulation defining a valid test, however, the State was required to prove compliance in order to establish the test's validity, following this court's decisions in Cannon and Clark-Munoz.
¶ 29 The majority's analysis troubles me because while it recognizes the State no longer must prove NIST traceability, it appears to perpetuate the notion the State must prove compliance with other machine maintenance protocols in order to establish the validity of a test result. This is inconsistent with the legislature's clear intent to remove barriers to effective enforcement of our drunk driving laws by disallowing admissibility challenges based on technical deficiencies having no effect on the accuracy of a test result. See LAWS OF 2004, ch. 68, § 1.[3]

ANALYSIS
¶ 30 Before Clark-Munoz, the touchstone for this court in evaluating the admissibility and validity of a breath test result was whether the State provided adequate assurance of the reliability and accuracy of the test. Thus, in State v. Baker, 56 Wash.2d 846, 852, 355 P.2d 806 (1960), this court derived its original foundational requirements from assertions by the State's experts that a breath test is "wholly unreliable" unless (1) the machine was properly checked and in proper working order at the time of the test, (2) the correct chemicals were used, (3) the test subject had nothing in his or her mouth at the time, and had not ingested anything within 15 minutes before taking the test, and (4) a properly trained operator administered the test in the proper manner.
¶ 31 Following Baker, this court consistently held once the State presents prima facie evidence of the foundational requirements, any challenges to the reliability and accuracy of the test go to the weight of the test result, not its admissibility. Allison, 148 Wash.2d at 86, 59 P.3d 85 (breath test ticket satisfies foundational requirements; "arguments as to the reliability of the particular test results are questions for the jury"); State v. Wittenbarger, 124 Wash.2d 467, 476, 880 P.2d 517 (1994) (defendants may challenge reliability of breath tests through cross-examination, expert testimony, and independent tests); State v. Straka, 116 Wash.2d 859, 875, 810 P.2d 888 (1991) (deviations from procedures for evaluating and certifying the machines, and for mixing the simulator solution, may be introduced to refute the accuracy and reliability of the test results but do not bar its admissibility); State v. Brayman, 110 Wash.2d 183, 192, 751 P.2d 294 (1988) ("[t]he defendant may introduce evidence refuting the accuracy and reliability of the test reading"); State v. Peterson, 100 Wash.2d 788, 791-92, 674 P.2d 1251 (1984) ("[a]ny challenge to the reliability of the Breathalyzer reading goes to its weight rather than to its admissibility;" declining to adopt more stringent foundational requirements following adoption of the per se offense); City of Bremerton v. Osborne, 66 Wash.2d 281, 282, 401 P.2d 973 (1965) (challenges to the operator's qualifications and sufficiency of machine maintenance procedures go to weight rather than admissibility); Baker, 56 Wash.2d at 853-54, 355 P.2d 806 (State's failure to use a reference thermometer *52 to calibrate Breathalyzer chamber and test ampoule does not bar admission of test result where there is no indication the machine thermometer malfunctioned).
¶ 32 The state toxicologist codified the Baker foundational requirements following the adoption of the implied consent statute, which provides a breath test is valid if performed "according to methods approved by the state toxicologist." RCW 46.61.506(3); Brayman, 110 Wash.2d at 193-94, 751 P.2d 294; State v. Franco, 96 Wash.2d 816, 819-20, 639 P.2d 1320 (1982).
¶ 33 After the Breathalyzer was replaced with the BAC Verifier DataMaster (DataMaster), the toxicologist adopted a streamlined set of breath test regulations, revised its recordkeeping policies, and formulated the bulk of the machine maintenance and simulator solution protocols as internal policies and procedures rather than formal administrative rules. Defendants challenged the changes as embodying a "prosecutorial bias" designed to facilitate convictions. Wittenbarger, 124 Wash.2d at 477, 880 P.2d 517. This court rejected the challenges, after finding the new regulations, policies, and procedures sufficiently assured the accuracy and reliability of breath test results. Wittenbarger, 124 Wash.2d 467, 880 P.2d 517 (State not required to preserve detailed machine maintenance records); Straka, 116 Wash.2d 859, 810 P.2d 888 (State not required to preserve invalid test messages); State v. Ford, 110 Wash.2d 827, 755 P.2d 806 (1988) (affirming toxicologist's approval of DataMaster); see also State v. Schulze, 116 Wash.2d 154, 804 P.2d 566 (1991) (toxicologist need not adopt a "cookbook" of protocols and procedures for administering alcohol concentration tests but may, instead, adopt general criteria).
¶ 34 In evaluating the propriety of the changes, this court stated the judiciary's "ultimate concern" is that the approved methods "result in an accurate test, competently administered, so that a defendant is assured that the test results do in fact reflect a reliable and accurate measure of his or her breath content." Ford, 110 Wash.2d at 833, 755 P.2d 806.
¶ 35 In approving the streamlined regulations, this court observed the DataMaster, unlike the Breathalyzer, is self-certifying. Wittenbarger, 124 Wash.2d at 483, 880 P.2d 517. Thus, the breath test ticket itself is a "crucial document" that evidences the machine was operating properly on a particular occasion. Id.; see also Allison, 148 Wash.2d at 83, 59 P.3d 85 (breath test ticket provides prima facie evidence of compliance with approved breath test procedures).
¶ 36 Importantly, the "relevant procedures" for determining whether a breath test was performed "`"according to methods approved by the state toxicologist"'" are those pertaining to the actual administration of the test. Allison, 148 Wash.2d at 80, 59 P.3d 85 (emphasis omitted) (quoting Ford, 110 Wash.2d at 833, 755 P.2d 806 (quoting RCW 46.61.506(3))).[4]
¶ 37 The toxicologist adopted a separate set of regulations, internal policies, and procedures relating to machine maintenance and the preparation of the simulator solution used in the test. See former WAC 448-13-110, -170, -080, and -160 (2001). Proof of compliance with this set of regulations was not a condition precedent to admissibility. Wittenbarger, 124 Wash.2d at 489-90, 880 P.2d 517; State v. Mee Hui Kim, 134 Wash. App. 27, 139 P.3d 354 (2006); Smith v. Dep't of Licensing, 88 Wash.App. 875, 944 P.2d 1117 (1997). Although "approved" by the toxicologist, these protocols and procedures represent best practices that exceed the minimum requirements that must be met to establish the admissibility and validity of a test result.[5]
*53 ¶ 38 The thermometer certification requirement became part of the regulation defining a valid test in 2001. Under former WAC 448-13-040 (1999), the operator may not proceed with the test unless the temperature of the simulator solution is "thirty-four degrees centigrade plus or minus 0.2 degrees centigrade." As proof of compliance with the requirement, the State presented evidence the breath test operator visually confirmed the temperature was within this range by reading the thermometer attached to the simulator, then entering "yes" in response to a question on the DataMaster. Allison, 148 Wash.2d at 82-83, 59 P.3d 85. Some defendants successfully moved to suppress breath tests results on the ground the State did not sufficiently establish compliance with the regulation. They argued, and trial courts agreed, the State must prove the actual temperature was within this required range, and that such proof was impossible due to a thermometer variance of 0.1 centigrade. Id. at 78, 59 P.3d 85. This court reversed the suppression rulings, interpreting the criterion as requiring proof the operator visually confirmed the thermometer reading, not proof of the actual temperature.[6]Id. at 86, 59 P.3d 85.
¶ 39 However, before this court decided Allison, the toxicologist amended the regulation to clarify his intention. Wash. St. Reg. XX-XX-XXX (Sept. 2, 2001). The amended regulation provided, "the operator must verify" the temperature is within the required range, using a thermometer "certified per WAC 448-13-035." Former WAC 448-13-040 (Supp.2002). Former WAC 448-13-035 (Supp.2002) required the annual certification of simulator thermometers "using a reference thermometer traceable to standards maintained by the National Institute of Standards and Testing (NIST)."
¶ 40 In Cannon, this court concluded former WAC 448-13-040 required the State to prove thermometer certification in order to establish the validity of the breath test, rejecting the State's argument that "certified per WAC 448-13-035," was merely a descriptive phrase that did not add to the State's foundational burden. Cannon, 147 Wash.2d at 59, 50 P.3d 627. Thus, for the first time, proof of compliance with a specific machine maintenance regulation became a foundational requirement.
¶ 41 In Clark-Munoz, this court shifted focus from accuracy and reliability to "fair play." Based on the principle the State must "abide by its own rules," this court held breath test results were invalid, as a matter of law, even though the record was devoid of evidence that noncompliance with the thermometer traceability requirement affected the accuracy or reliability of any breath test result. Clark-Munoz, 152 Wash.2d at 50, 93 P.3d 141. Compare Wittenbarger, 124 Wash.2d at 483, 880 P.2d 517 (failure to comply with regulation requiring periodic certification of testing machine did not require suppression of test results made on a DataMaster, which, unlike the older Breathalyzer, is self-certifying); City of Seattle v. Rainwater, 86 Wash.2d 567, 546 P.2d 450 (1976) (failure to follow 1 ½ minute waiting period at step 7 of new 11 step procedure did not invalidate a test made on an older model machine where the evidence showed the deviation had no effect on an accurate reading); compare Baker, 56 Wash.2d at 852-53, 355 P.2d 806 (observation of test subject for only 14 minutes invalidated test where State's expert stated test is "wholly unreliable" absent at least a 15 minute waiting period).
¶ 42 In response to Clark-Munoz, the legislature amended the drunk driving statute to mandate that breath tests are admissible when the State produces prima facie evidence of compliance with a codified set of foundational requirements. LAWS OF 2004, ch. 68, § 4. The 2004 amendment was intended to eliminate challenges to breath test admissibility *54 based on technical deficiencies not shown to adversely affect the accuracy of the result. City of Fircrest v. Jensen, 158 Wash.2d 384, 399, 143 P.3d 776 (2006). In Jensen, we rejected a constitutional challenge to the amending legislation, holding it does not violate the separation of powers doctrine. Id. We observed the 2004 amendment merely codifies the foundational requirements for breath tests as developed by case law, and represents the legislature's intent "to return the requirements of BAC test admissibility to the way it was before our holding in Clark-Munoz." Id. at 396-97, 143 P.3d 776.
¶ 43 As amended in 2004, RCW 46.61.506(4) prohibits the suppression of breath test results based on technical deficiencies that do not adversely affect the accuracy or reliability of the test result. Breath tests now are treated like other scientific evidence: once the State satisfies the foundational requirements, test results generally are admissible. Jensen, 158 Wash.2d at 397, 143 P.3d 776 (citing State v. Copeland, 130 Wash.2d 244, 254, 922 P.2d 1304 (1996)). In codifying the foundational requirements, the legislature sought to achieve greater uniformity in admissibility determinations and make our drunk driving laws more effective. LAWS OF 2004, ch. 68, § 1. When deviations from additional testing procedures or machine maintenance protocols are so serious as to render test results unreliable, a court has discretion to exclude them in accordance with the rules of evidence. See Jensen, 158 Wash.2d at 398-99, 143 P.3d 776 (following enactment of Substitute House Bill 3055, courts continue to have discretion to exclude breath test results on grounds of irrelevancy and undue prejudice); Copeland, 130 Wash.2d at 270, 922 P.2d 1304 (test results may be excluded under ER 702 as "not helpful to the jury" when laboratory error renders the results unreliable). However, ordinarily, such deviations go to the weight, not the admissibility, of the test results. Id. at 271-72, 922 P.2d 1304; State v. Kalakosky, 121 Wash.2d 525, 541, 852 P.2d 1064 (1993); State v. Cauthron, 120 Wash.2d 879, 890, 846 P.2d 502 (1993).

CONCLUSION
¶ 44 Following Cannon and Clark-Munoz, the State's failure to prove compliance with the thermometer certification protocol renders Ludvigsen's breath test invalid as a matter of law. Thus, I concur in the result.
¶ 45 However, our legislature has now mandated that breath test results will be suppressed due to procedural deficiencies only if shown to adversely affect the accuracy or reliability of a breath test. Once the State produces prima facie evidence of compliance with the statutory foundational requirements, breath test results are admissible, with all other challenges to the test's accuracy or reliability going to the weight of the evidence. See ER 401, 402, 403, 702.
NOTES
[1] Former Seattle Municipal Code (SMC) 11.56.020(A)(1)(a) (2002).
[2] See former WAC 448-13-035 (1991). Chapter 448-13 WAC was repealed by Wash. St. Reg. XX-XX-XXX (Oct. 23, 2004).
[3] WAC 448-16-020.
[4] The city ordinance, SMC 11.56.020(A), is titled driving while intoxicated (DWI) and the state statute, RCW 46.61.502, is titled driving under the influence (DUI). However, for the purposes of this opinion, the two different phrases describe the same criminal act.
[5] WAC 448-16-020(2) approves the following thermometers:

(a) Mercury in glass thermometers with a scale graduated in tenths of a degree measuring a range between 33.5 and 34.5 degrees centigrade.
(b) Digital thermometer system contained within the Guth 2100 wet bath simulator.
[6] RCW 46.61.506 states:

(3) Analysis of the person's blood or breath to be considered valid under the provisions of this section or RCW 46.61.502 or 46.61.504 shall have been performed according to methods approved by the state toxicologist and by an individual possessing a valid permit issued by the state toxicologist for this purpose. The state toxicologist is directed to approve satisfactory techniques or methods, to supervise the examination of individuals to ascertain their qualifications and competence to conduct such analyses, and to issue permits which shall be subject to termination or revocation at the discretion of the state toxicologist.
[7] Former SMC 11.56.020(A), titled driving while intoxicated stated:

1. A person is guilty of driving while under the influence of intoxicating liquor or any drug if a person drives the vehicle within the City:
a. and the person has, within two (2) hours after driving, an alcohol concentration of 0.08 or higher, as shown by analysis of the person's breath or blood made under the provisions of this section; or
b. while the person is under the influence of or affected by intoxicating liquor and any drug; or
c. while the person is under the combined influence of or affected by intoxicating liquor and any drug.
[8] At the hearing, the City cited State v. MacKenzie, 114 Wash.App. 687, 699-700, 60 P.3d 607 (2002) ("[T]he effective date of an administrative regulation does not prohibit the regulation from applying retroactively where the purpose of the regulation is . . . remedial. . . . `[A remedial statute] relates to "practice, procedure, or remedies and does not affect a substantive or vested right."'") (quoting Bayless v. Cmty. College Dist. No. XIX, 84 Wash.App. 309, 312, 927 P.2d 254 (1996) (quoting F.D. Processing, 119 Wash.2d 452, 462-63, 832 P.2d 1303 (1992))). The superior court also relied on MacKenzie. MacKenzie reviewed an emergency amendment to former WAC 448-13-060 (1991), enacted to correct an inadvertent omission. When the blood alcohol level was lowered from 0.10 to 0.08, the WACs were amended. The state toxicologist forgot to amend former WAC 448-13-060 which defined the proper external standard result, as between .090 and .110. An emergency amendment was enacted and declared to apply retroactively. The appellate court ruled it was "curative" and "remedial" and thus was applied retroactively. MacKenzie, 114 Wash.App. at 701, 60 P.3d 607. The City also cited Letourneau v. Department of Licensing, 131 Wash.App. 657, 666, 128 P.3d 647 (2006) (finding the 2004 amendments to former WAC 448-13-020 (1991) were remedial).
[9] Former SMC 11.56.020(A) is analogous in this respect.
[10] This conclusion refers solely to the statutory and regulatory scheme in place at the time and is not intended to contradict the current foundational requirements for admissibility of breath tests under RCW 46.61.506.
[11] In City of Fircrest v. Jensen, 158 Wash.2d 384, 399, 143 P.3d 776 (2006), a plurality of this court, reviewing other 2004 changes to the DWI statutes, observed those changes went to the reliability and admissibility of the breath test. However, the challenge there was whether the changes violated due process by shifting the burden of proof to the defendant that the evidence was unreliable. The seven justices of this court who upheld the constitutionality of the 2004 amendments in Jensen did not examine the issue before us today.
[12] Clark-Munoz also held that breath test evidence could not be admitted as "other evidence" under RCW 46.61.506(2). Clark-Munoz, 152 Wash.2d at 50, 93 P.3d 141. See SMC 11.56.020(A)(1)(b) for the analogous city code provision.
[1] See also former WAC 448-13-060(5) (2001 & Supp.2002) ("the criteria applied to determine the validity of any test and so certify it, should be those provisions of the Washington Administrative Code in effect at the time the test is administered").
[2] See Poston v. Clinton, 66 Wash.2d 911, 915-16, 406 P.2d 623 (1965) (holding an amended statute governing breath test procedures operates prospectively since the legislature intended a breath test to be administered in compliance with then-applicable procedures).
[3] "The legislature finds that previous attempts to curtail the incidence of driving while intoxicated have been inadequate. The legislature further finds that property loss, injury, and death caused by drinking drivers continue at unacceptable levels. This act is intended to convey the seriousness with which the legislature views this problem. To that end the legislature seeks to ensure swift and certain consequences for those who drink and drive.

To accomplish this goal, the legislature adopts standards governing the admissibility of tests of a person's blood or breath. These standards will provide a degree of uniformity that is currently lacking, and will reduce the delays caused by challenges to various breath test instrument components and maintenance procedures. Such challenges, while allowed, will no longer go to admissibility of test results. Instead, such challenges are to be considered by the finder of fact in deciding what weight to place upon an admitted blood or breath test result." LAWS OF 2004, ch. 68, § 1.
[4] Under the former regulations, these were codified in former WAC 448-13-060 (2001) (validity and certification of test results), which incorporated by reference former WAC 448-13-040 (administration of breath test on the DataMaster), former WAC 448-13-050 (2001) (test defined), and former WAC 448-13-055 (2001) (interference with breath test). Former WAC 448-13-060 provided, "[a] test shall be a valid test" if certain criteria are met. It further provided, "[i]f these criteria are met, then these and no other factors are necessary to indicate the proper working order of the instrument, and so certify it, at the time of the breath test."
[5] See Washington State Patrol, Breath Test Section, Breath Test Program Policy and Procedure Manual, Purpose Statement: "This notebook should contain the most recent written policies and procedures followed by personnel within the Breath Testing Program. Generally, these policies and procedures exceed the requirements of the Washington Administrative Code and reflect an attempt to ensure the highest possible confidence in the Breath Testing Program." Available at http://breathtest.wsp.wa.gov/default.asp (follow link to BTP Public Records Index) (last visited Dec. 19, 2007).
[6] The regulations applicable in Allison did not include the thermometer certification requirement at issue in Cannon and Clark-Munoz.