# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| DAVITA HEALTHCARE PARTNERS, INC., | ) ) ) | No. 73630-2-I |
| Appellant, | ) ) | DIVISION ONE |
| v. | ) ) | PUBLISHED OPINION |
| WASHINGTON STATE DEPARTMENT OF HEALTH and NORTHWEST KIDNEY CENTERS, | ) ) ) ) ) | |
| Respondents. | ) ) | FILED: December 28, 2015 |

APPELWICK, J. — Both DaVita and Northwest Kidney Centers (NKC) submitted certificate of need applications for five kidney dialysis stations in south King County. DaVita sought to build a new facility to accommodate the stations whereas NKC sought to expand an existing facility. The Department of Health's Certificate of Need Program concluded that DaVita's application satisfied more of WAC 246-310-288's criteria than NKC's application. It awarded DaVita the certificate of need. The health law judge reversed and granted NKC's certificate of need application. He reasoned that the program erred in utilizing the tie breaker criteria in WAC 246-310-288, because NKC's application met all of the review standards under WAC 246-310-210, -220, -230, and -240 and DaVita's did not. We affirm.

## BACKGROUND

In 1979, the Washington legislature enacted the State Health Planning and Resources Development Act (Act), chapter 70.38 RCW. Univ. of Wash. Med. Ctr. v. Dep't of Health, 164 Wn.2d 95, 99, 187 P.3d 243 (2008). The Act allows

Washington to control the number of healthcare providers entering the market by requiring the facility or program to obtain a certificate of need (CN). King County Public Hosp. Dist. No. 2. v. Dep't of Health, 178 Wn.2d 363, 366, 309 P.3d 416 (2013). The legislature intended the CN requirement to provide accessible health services and assure the health of all citizens in the state while controlling costs. Id.; RCW 70.38.015(1), .015(2).

CN applications for new health care facilities, new services, and expansion of existing health care facilities are subject to concurrent review. RCW 70.38.115(7). Concurrent review is "for the purpose of comparative analysis and evaluation of competing or similar projects in order to determine which of the projects may best meet identified needs." Id. During the review process, the Department of Health (Department) is required to evaluate CN applications based on criteria set forth in its regulations. WAC 246-310-200(2). All CN applications are reviewed by the Department on the basis of need, financial feasibility, structure and process of care, and cost containment. WAC 246-310-210 (need); WAC 246-310-220 (financial feasibility); WAC 246-310-230 (structure and process of care); WAC 246-310-240 (cost containment).

Kidney dialysis facilities are among those facilities required to obtain CN approval. RCW 70.38.105(4)(a), (4)(h); RCW 70.38.025(6); WAC 246-310-020(1)(a), (1)(e); WAC 246-310-010(26). The Department has also adopted additional CN criteria that apply to only kidney disease treatment centers. See WAC 246-310-280 through -289. WAC 246-310-282 states that kidney dialysis facilities are, like other CN applications, to be reviewed concurrently. RCW

2

70.38.115(7). The facilities competing to provide services in the same planning area are reviewed simultaneously by the Department. WAC 246-310-280(3). Applications to establish kidney disease treatment centers are reviewed on one of four quarterly review cycles, which allows the Department to compare the competing applications for specific planning areas. WAC 246-310-282; WAC 246-310-280(9).

Like other CN applications, a kidney dialysis facility must meet the applicable review criteria in WAC 246-310-210, -220, -230, and -240. WAC 246-310-284. If two or more applications "meet all applicable review criteria and there is not enough station need projected for all applications to be approved, the department will use tie-breakers to determine which application or applications will be approved." WAC 246-310-288.

The tie breaker system awards points for various criteria. See WAC 246-310-288. The first five criteria (training services, private rooms for isolating patients, permanent bed stations, evening shift, and meeting the projected need) allow multiple applicants to receive points. WAC 246-310-288(1)(a), (b), (c), (d), (e). The remaining four tie breaker points (economies of scale, historical provider, patient geographical access, and provider choice) may be awarded to only one applicant. WAC 246-310-288(2)(a), (b), (c), (d).

## FACTS

NKC is a Washington not for profit 501(c)(3) corporation that owns and operates 14 dialysis facilities in Washington. Thirteen of NKC's Washington dialysis facilities are in King County including one facility in SeaTac. DaVita is a

3

publicly held, for-profit corporation that provides dialysis services in multiple states including Washington. DaVita owns or operates 24 kidney dialysis centers in Washington and four are in King County.

In May 2011, NKC applied for a CN to add five dialysis stations to its SeaTac facility. The application proposed to increase the existing SeaTac facility's capacity from 25 dialysis stations to 30 stations. NKC's initial estimated capital expenditure for the project was $100,969. That same month, DaVita applied for a CN to build a new, five station dialysis facility in Des Moines. DaVita's initial capital expenditure was estimated at $1,824,465. DaVita amended its application in June 2011 and revised the capital expenditure estimate to $1,992,705.

Both NKC's and DaVita's CN applications sought to add dialysis stations located in King County Planning Area No. 4. King County Planning Area No. 4 is a geographic area south of Seattle that includes SeaTac, Burien, Normandy Park, Tukwila, and Des Moines. WAC 246-310-280(9)(a). The planning area is currently served by one kidney disease treatment center—NKC's 25 station facility in SeaTac.

Because both applicants proposed to serve residents in the same planning area within King County, the Program reviewed the applications concurrently.[1] The Program considered whether both applicants satisfied the WAC 246-310-210, -220, -230, and -240 requirements. The Program concluded that both NKC and DaVita satisfied the need, financial feasibility, and structure and process of care

---

[1] Because the health law judge's decision is ultimately the Department's final decision, we refer to the Program's initial decision as the Program's decision. See DaVita, Inc. v. Dep't of Health, 137 Wn. App. 174, 181, 151 P.3d 1095 (2007).

requirements. But, it concluded that only DaVita's project met the cost containment criteria in WAC 246-310-240(1) and (2).[2]

As to the cost containment criteria, the Program noted that it performs its analysis by taking a multi-step approach. It stated that step one is determining whether the application has met the criteria of WAC 246-310-210, -220, and -230. Because it found both NKC and DaVita met the applicable review criteria, the Program proceeded to step two.

In step two, the Program stated that it assesses the other options the applicant or applicants considered prior to submitting their applications. The Program explained that if it determines that the proposed project is better or equal to other options the applicant considered before submitting its application, it proceeds to step three. Here, the Program found that there were no superior alternatives that either NKC or DaVita considered or should have considered.

---

[2] WAC 246-310-240(1) through -240(2) states:

A determination that a proposed project will foster cost containment shall be based on the following criteria:

(1) Superior alternatives, in terms of cost, efficiency, or effectiveness, are not available or practicable.

(2) In the case of a project involving construction:

(a) The costs, scope, and methods of construction and energy conservation are reasonable; and

(b) The project will not have an unreasonable impact on the costs and charges to the public of providing health services by other persons.

Consequently, the Program continued to its third step—applying the tie breaker criteria under WAC 246-310-288. The Program awarded both NKC and DaVita five tie breaker points for those points that may be allotted to multiple applicants: training services, private rooms for isolating patients, permanent bed stations at the facility, evening shift, and meeting the projected need. But, for those points that only one applicant may receive, the Program awarded DaVita two points (patient geographical access and provider choice) and NKC only one (economies of scale). Because DaVita received more tie breaker points than NKC, on March 5, 2012, the Program awarded DaVita the CN for its proposed five station facility. It denied NKC's application.

On March 8, 2012, NKC requested an adjudicative proceeding. Among other things, NKC argued that instead of evaluating which of the applications under review represented the superior alternative in terms of cost, efficiency, and effectiveness as required by WAC 246-310-240, the Program improperly jumped directly to a tie breaker analysis under WAC 246-310-288. Citing to the plain language of WAC 246-310-288, NKC claimed that a tie breaker analysis is relevant only after a determination is made that the competing applications satisfied all criteria—including the criteria listed under WAC 246-310-240. NKC argued that only its application satisfied all criteria—DaVita's application failed the financial feasibility criteria in WAC 246-310-220(2) and NKC's application was the superior application under WAC 246-310-240.

At an administrative hearing before a health law judge (HLJ), the parties presented evidence and argument. The HLJ issued an order on March 22, 2013

6

effectively reversing the Program's decision and awarding the CN to NKC. The HLJ found that the Program properly determined that both NKC and DaVita met the WAC 246-310-210 determination of need requirement and the WAC 246-310-230 structure and process of care requirement. But, the HLJ found that financial feasibility under WAC 246-310-220 was where the differences between the two applications became the most distinct.[3]

The HLJ found that both applicants could finance their projects. He next turned to whether operating costs could be met. NKC projected that its net profit for the five dialysis stations after three years[4] would be $76,465. DaVita initially reported that in its third year it would have a net loss of $22,717. But, DaVita revised its pro forma to show a net gain of $21,841 in its third year. It did so by removing landlord operating expenses (landlord taxes, common area maintenance charges, and insurance charges).

---

[3] WAC 246-310-220 provides:

The determination of financial feasibility of a project shall be based on the following criteria.

(1) The immediate and long-range capital and operating costs of the project can be met.

(2) The costs of the project, including any construction costs, will probably not result in an unreasonable impact on the costs and charges for health services.

(3) The project can be appropriately financed.

[4] The HLJ recognized that the Program has developed a practice of considering the income and expenses for the third year of operations as an indicator of financial feasibility.

7

Applying either DaVita's initial third year projection or the revised third year projection, the HLJ commented that he was struck by the difference in net revenues. He noted that both applications involved the same number of dialysis stations and both have a high percentage of Medicare/Medicaid patients who would provide the same fixed reimbursement for dialysis service to both facilities.[5] The HLJ assumed that because the geographical area covered by the five additional dialysis stations would be the same, the projected need for the dialysis is the same, the ratio of Medicare/Medicaid to commercial payor reimbursement patients would be the same, and thus the income should be the same for both facilities.

But, he noted that DaVita's income was projected to be much higher and found that DaVita would only achieve this higher income by charging commercial insurance carriers more. The HLJ thus found this would have an impact on the cost of health services, because insurance companies would adjust their premiums to cover the increased cost of dialysis at DaVita's facility. But, he reasoned that whether this would have an "unreasonable impact" on the costs of health services under WAC 246-310-220 depended upon the available alternatives.

Thus, the HLJ stated that whether the applicants met the criteria of WAC 246-310-220 was dependent upon WAC 246-310-240's superior alternative analysis. In other words, the HLJ reasoned that WAC 246-310-220(2)'s financial

---

[5] In terms of revenue, the majority of patients who seek dialysis treatment pay through Medicare/Medicaid. The rest either have other insurance (commercial payors) or private funding. Medicare/Medicaid reimbursement rates for health services are fixed by the federal government, but commercial rates are negotiated by each facility.

feasibility criteria—whether the costs of the project will result in an unreasonable impact on the costs and charges for health services—could not be considered in isolation of WAC 246-310-240(1)'s criteria that the Department must consider superior alternatives in terms of cost, efficiency, and effectiveness. The HLJ reasoned that the "superior alternative" prong of the cost containment analysis was not only a comparison of each individual applicant's proposal to its own alternatives, but also a comparison of the applicants' proposals to each other.

After considering the first "superior alternative" prong of WAC 246-310-240's cost containment analysis, the HLJ found that given the alternative, NKC's project, DaVita's project had an unreasonable impact on health care costs and thus did not meet the criteria in WAC 246-310-220. He reasoned that because DaVita was reporting higher revenues, either patients would be paying more or insurance companies would be paying more and passing those costs onto their insureds. The HLJ then considered the other two prongs of WAC 246-310-240's cost containment criteria.

The HLJ ultimately found that NKC's application met all four required criteria whereas DaVita's met only the need and structure and process of care criteria (WAC 246-310-220 and -230). Consequently, the HLJ awarded NKC the CN. DaVita and the Program moved for reconsideration. In its motion for reconsideration DaVita argued that the HLJ improperly elevated the importance of cost over access to health care. And, it claimed that the HLJ's order erroneously rejected the Program's three step approach for comparing applications under WAC 246-310-240. DaVita asserted that the order effectively invalidates the tie breaker

rule by replacing the objective tie breakers with a standardless and open-ended comparison. The HLJ denied the motions for reconsideration.

On July 31, 2013, DaVita petitioned for review to the superior court. The superior court affirmed the HLJ's decision. It concluded that the HLJ correctly interpreted and applied the CN statutes and regulations and that substantial evidence supports the HLJ's findings. It reasoned that the language in WAC 246-310-288 is clear that the tie breakers are to be reached only in the event that the two applicants first satisfy all of the applicable review criteria in WAC 246-310-210, -220, -230, and -240. DaVita appeals.

## DISCUSSION

In reviewing administrative action, this court sits in the same position as the superior court, applying the Washington Administrative Procedure Act (WAPA), chapter 34.05 RCW, to the record before the agency. DaVita, Inc. v. Dep't of Health, 137 Wn. App. 174, 180, 151 P.3d 1095 (2007). The agency decision is presumed correct and the party challenging the validity of the agency's action bears the burden of showing the action was invalid. RCW 34.05.570(1)(a); Providence Hosp. of Everett v. Dep't of Social & Health Servs., 112 Wn.2d 353, 355, 770 P.2d 1040 (1989). All the parties agree that the HLJ's written order is the final decision of the agency that is the subject of this court's review—not the Program's written evaluation.

Under WAPA, this court grants relief in only limited circumstances. DaVita, 137 Wn. App. at 181. This court may grant relief where the agency engaged in unlawful procedure, RCW 34.05.570(3)(c); the agency has erroneously interpreted

10

or applied the law, RCW 34.05.570(3)(d); or substantial evidence does not support the agency's order. RCW 34.05.570(3)(e). Id. This court reviews the interpretation of agency rules de novo using the same principles it applies to interpreting statutes. Grays Harbor Energy, LLC v. Grays Harbor County, 175 Wn. App. 578, 583-84, 307 P.3d 754 (2013).

I.    When to Apply WAC 246-310-288

DaVita argues the HLJ failed to apply the standards set forth in the Department's CN regulations, because he did not use the tie breaker criteria set forth in WAC 246-310-288 to decide between competing kidney dialysis facility applications. It first argues that under the plain language of the regulations, the regulatory tie breakers are the only permissible basis to compare competing kidney dialysis facility applications. And, it argues that the Department is required to use these tie breakers when choosing between competing applications.

If the meaning of a rule is plain and unambiguous on its face, the court should give effect to that plain meaning. Overlake Hosp. Ass'n v. Dep't of Health, 170 Wn.2d 43, 52, 239 P.3d 1095 (2010). If there is more than one reasonable interpretation of a regulation, an ambiguity exists. Id. If a regulation is deemed ambiguous, this court may resort to statutory construction, legislative history, and relevant case law in order to resolve the ambiguity. Id.

Therefore, we first look to the plain language of WAC 246-310-288. WAC 246-310-288 states in part:

> If two or more applications meet all applicable review criteria and there is not enough station need projected for all applications to be approved, the department will use tie-breakers to determine

which application or applications will be approved. The department will approve the application accumulating the largest number of points.

DaVita relies on the language that the "department will use tiebreakers" and that the "department will approve the application accumulating the largest number of points" to argue that the plain language of the regulation is clear and the tie breakers must always be applied. Id. (emphasis added). But, in so arguing, DaVita ignores the opening clause of the regulation: "If two or more applications meet all applicable review criteria." Id. (emphasis added). WAC 246-310-200 provides the applicable review criteria for the Department to follow when reviewing certificate of need applications. And, WAC 246-310-284 provides the applicable review criteria and standards for review of kidney treatment facility CN applications specifically. They both mandate consideration of the criteria in WAC 246-310-210, -220, -230, and -240. WAC 246-310-200(2); WAC 246-310-284. We conclude that the plain language is clear that the tie breakers are applied only if both applications first satisfy all other review criteria in WAC 246-310-210, -220, -230, and -240. Thus, the HLJ did not err simply because he never reached the tie breakers.[6]

---

[6] Because we conclude that the language of WAC 246-310-288 is plain on its face and unambiguous, we do not reach DaVita's arguments that the legislative and agency intent favor its interpretation. Nor do we reach any of DaVita's arguments based on other canons of construction. But, we note that since WAC 246-310-288 became effective on January 1, 2007, two other HLJs have similarly interpreted WAC 246-310-288. Ruling Granting in Part Motion for Summary Judgment & Den. Cross-Motion for Summary Judgment, In re Certificate of Need on the Applications of Puget sound Kidney Centers and DaVita, Inc., No. M2008-118573 (Dep't of Health Feb. 27, 2009); Ruling on Motion for Summary Judgment & Order on Motion for Partial Summary Judgment, In re Evaluation of Two Certificate of Need Applications Submitted by Cent. Wash. Health Servs. & DaVita, Inc., M2008-118469 (Dep't of Health April, 15, 2009). And, WAC 246-310-288 remains unchanged.

II. Comparative Review

Next, DaVita argues that the HLJ erred as a matter of law by directly comparing NKC's and DaVita's applications when determining whether DaVita's project would have an unreasonable impact on health care costs. The HLJ concluded as compared to NKC's project, DaVita's project has an unreasonable impact on health care costs, because it does not meet the criteria in WAC 246-310-220. He therefore found that NKC was the superior alternative under WAC 246-310-240.

WAC 246-310-220 is the "financial feasibility" criteria. One criterion under -220 is that the costs of the project will probably not result in an unreasonable impact on the costs and charges for health services. WAC 246-310-220(2). Here, the HLJ found that NKC's expenses are reasonable. By contrast he found that because DaVita's expenses were 19 times that of NKC's, it would have to increase its billing to non-Medicare patients who have insurance or other funding in order to account for its higher expenses and in order to reach its projected revenues. He found that this would have an impact on the costs of health services. But, he stated that the remaining question of whether DaVita's impact on the costs of health services were unreasonable depended upon the costs of health services attributable to the alternative applications—here, NKC.

WAC 246-310-240 is the "cost containment" criteria. WAC 246-310-240(1) states that superior alternatives in terms of cost, efficiency, or effectiveness are not available or practicable. The HLJ concluded that NKC was the superior

alternative under WAC 246-310-240, because DaVita's project had an unreasonable impact on health care costs.

DaVita argues that the HLJ erred as a matter of law when he improperly converted a reasonableness standard into a binary comparison between the applications. In other words, DaVita argues that each application should have been evaluated based on whether they would individually have an objectively unreasonable impact on health care costs. But, both the general CN application process and the specific kidney treatment center CN application process are, by law, concurrent review processes. RCW 70.38.115(7); WAC 246-310-282; WAC 246-310-280(3). The processes are considered to be and designed to be competitive review processes. RCW 70.38.115(7). Thus, we conclude that the HLJ did not err to the extent he directly compared the two applications under the relevant review criteria and determined reasonability comparatively.

III.   Type of Evidence Considered During Comparative Review

Next, DaVita argues that the HLJ erred when he considered commercial reimbursement rates[7] when comparing the two applications. DaVita also argues that the HLJ erred when he considered capital costs, because capital costs are only appropriately considered as a tie breaker criterion.

The HLJ considered both the estimated capital costs and commercial reimbursement rates when analyzing and comparing the two applications under

---

[7] Commercial reimbursement rates represent the amount of money the facility receives from insurance companies for various health services and procedures. There is a difference between the gross charge to an insurance company for a health service and what each facility actually collects from the insurance company.

WAC 246-310-220 and WAC 246-310-240. He reasoned that the only way DaVita would be able to generate enough income to meet operational expenses by its third year—because of its higher capital costs—would be to receive higher reimbursements from non-Medicare patients who have insurance or other funding. He stated this was so, because the dollar amount of Medicare reimbursements for dialysis are fixed by federal law so that the only area where profit can be increased is by increasing billing to those non-Medicare patients who have insurance or other private funding. He concluded this, by definition, has an impact on the costs of health services.

DaVita contends that the commercial reimbursement rate is not a proper basis for comparison, because the Department chose not to include it as one of the tie breaker criteria. But, as stated by the HLJ, the commercial payor reimbursement rates have the capability of directly impacting the cost of health services and the cost of the project to the public—criteria directly enumerated in WAC 246-310-220 and -240.

DaVita also contends that its higher commercial reimbursement rate is an improper consideration, because it is an inaccurate measurement of actual cost of health services. DaVita asserts that commercial insurers pay it more not because they need to do so to make up for a higher actual cost of health services, but because of the strong quality of dialysis care DaVita provides. DaVita cites to its vice president's testimony that most of the health care costs for a patient needing dialysis is not for dialysis, but for hospitalizations and more expensive care. DaVita relies on that testimony and asserts that a higher commercial reimbursement rate

may reflect the fact that an insurer is willing to pay more for dialysis services, because it will reduce a patient's total health care costs. But, the HLJ specifically found that basic dialysis procedures are standardized and similar and that there would be no reason why commercial payors would expect DaVita's dialysis care to result in fewer health care costs later on. DaVita does not challenge this specific finding nor does it submit controverting evidence. Therefore, we conclude that DaVita did not satisfy its burden of showing that the HLJ's consideration of commercial reimbursement rates was invalid.

DaVita also argues that consideration of capital costs is only an appropriate basis for comparison as one of the tie breakers. DaVita provides no additional argument or authority to support this assertion. While there is an "economies of scale" tie breaker in WAC 246-310-288, both WAC 246-310-220 and -240 specifically direct that the costs of the project be taken into consideration. And, WAC 246-310-240(1) specifically directs the superior alternative be determined by considering cost, efficiency, or effectiveness. Capital costs are relevant to this analysis. Therefore, we conclude that DaVita did not satisfy its burden of showing that the HLJ's consideration of capital costs during its comparison of the applications was invalid.

IV.    Substantial Evidence

Finally, DaVita argues that the HLJ's finding that its project would have an unreasonable impact on health care costs was not supported by substantial

16

evidence.[8] DaVita argues that there was no evidence in the record of the actual impact of the costs to build DaVita's facility or the impact of the differential between the commercial reimbursement rates received by DaVita and NKC on health care costs. DaVita contends that the HLJ's finding was based on mere speculation that does not constitute substantial evidence.

This court reviews an agency's factual findings to determine whether they are supported by substantial evidence sufficient to persuade a fair minded person of the declared premise. DaVita, 137 Wn. App. at 181. We overturn an agency's factual findings only if they are clearly erroneous. Id. As the party challenging the HLJ's findings, DaVita must establish that the findings are erroneous. Univ. of Wash. Med. Ctr., 164 Wn.2d at 104. The court will review the evidence in the light most favorable to the party who prevailed in the highest forum that exercised fact finding authority—here, NKC. Id.

Evidence in the record indicates that DaVita's capital costs were 19 times that of NKC's ($1,992,705 as compared to $100,969). NKC's revenue would exceed its expenses in every year of operation while DaVita's revenue would not if DaVita included all necessary operating expenses in its profit and loss statement. There was evidence that NKC's expenses per treatment would thus be significantly lower than DaVita's. And, there was evidence of the differential between NKC's

---

[8] DaVita also argues the HLJ's WAC 246-310-240(2)(b) analysis was legally flawed. And, it argues that the HLJ's finding that DaVita's application failed WAC 246-310-240(2)(b) is not supported by substantial evidence. But, DaVita raises these arguments for the first time in its reply brief. This court does not consider arguments raised for the first time in a reply brief. Nakatani v. State, 109 Wn. App. 622, 625 n.1, 36 P.3d 1116 (2001).

and DaVita's commercial reimbursement rates in the record. DaVita stipulated to the fact that it negotiates and receives higher commercial reimbursement rates than NKC. And, there was evidence in the record—in the form of estimated calculations—that DaVita received $1,187.60 per treatment from commercial payors whereas NKC received only $1,048.82 from commercial payors.[9]

Substantial evidence in the record shows that DaVita's more expensive proposal will result in significantly greater costs to provide the dialysis services than NKC. The inference that those costs will be passed to private pay patients and/or their insurers is not unreasonable.

DaVita argues that notwithstanding the evidence that DaVita's commercial reimbursement rates are higher than NKC's, that the HLJ's determination still requires additional evidence: (1) that reimbursement rates for one service (kidney dialysis) would have a material effect on the overall cost of health insurance and (2) that opening one five station facility in Des Moines would cause an increase in the premiums charged by health insurers. But, this misstates the standard. Instead, the Department should find that the costs of the project will probably not result in an unreasonable impact on the costs and charges for health services. WAC 246-310-220(2). DaVita provides no authority that the unreasonable impact contemplated in this regulation applies to anything more than the services to be offered pursuant to the CN process. Substantial evidence demonstrates that

---

[9] The CN application process is based on the submission of pro formas based largely on estimates. Much of the documentation of costs to be incurred and charges to be made contained in materials submitted to the Department are merely estimates. This fact does not render the calculations made from those numbers speculative.

significantly higher rates for dialysis services will be charged to private pay patients and/or their insurers under DaVita's proposal. This evidence strongly undercuts a required finding that the costs of the project will probably not result in an unreasonable impact on the costs and charges for health services. Viewing the evidence in the light most favorable to NKC, the HLJ's finding of a probable unreasonable impact on costs or charges was not clearly erroneous.

We affirm.

WE CONCUR: