[No. 82728-1.  En Banc.]
Argued May 20, 2010.     Decided September 23, 2010.

OVERLAKE HOSPITAL ASSOCIATION ET AL., *Respondents*, v. THE DEPARTMENT OF HEALTH ET AL., *Petitioners*.

---

44

*Robert M. McKenna,* Attorney General, *Anne E. Egeler,* Deputy Solicitor General, and *Richard A. McCartan* and *Michael S. Tribble,* Assistants, for petitioner Department of Health.

*Peter S. Ehrlichman* (of *Dorsey & Whitney LLP*) and *Brian W. Grimm* (of *Bennett Bigelow & Leedom*), for petitioner Swedish Health Services.

*Donald W. Black, E. Ross Farr,* and *Jeffrey D. Dunbar* (of *Ogden Murphy Wallace PLLC*) for respondents Overlake Hospital Association and Overlake Hospital Medical Center.

*James S. Fitzgerald* and *Gregory A. McBroom* (of *Livengood Fitzgerald & Alskog*), for respondent King County Public Hospital District No. 2.

*Scott Easter, Benjamin I. VandenBerghe,* and *Kristiana F. O'Brien* on behalf of Proliance Surgeons Inc., amicus curiae.

¶1 ALEXANDER, J. — Swedish Health Services (Swedish) and the Washington State Department of Health (Department) seek review of a decision of the Court of Appeals, in which that court concluded that the Department used flawed methodology in determining that there was need for an additional ambulatory surgical facility (ASF) in East King County.[1] Swedish and the Department's principal argument is that the Court of Appeals did not accord sufficient deference to the Department's interpretation of the regulatory language relating to the process for obtaining a certificate of need. We agree with Swedish and the Department and, consequently, reverse the Court of Appeals.

I

¶2 In 1979 the legislature created the certificate of need (CN) program, which authorizes the Department to control the number and types of health care services and facilities that are provided in a given planning area. *See* RCW 70.38.015(2). The purpose behind this legislation was to ensure that such services and facilities are developed in a manner consistent with identified priorities and without unnecessary duplication. Under this statutory regime, in order for certain health care providers to establish or expand health care facilities within this state, including ASFs, they must obtain a CN from the Department. *See* WAC 246-310-020(a)(i).

¶3 In determining whether there is need for an additional ASF in a given area, the Department employs the three-step methodology set forth in WAC 246-310-270(9). The steps, denominated in WAC 246-310-270(9)(a), (b), and (c), are designed to determine (a) the existing capacity of operating rooms in the planning area, (b) the anticipated number of surgeries in the area three years into the future, and (c) whether existing operating room capacity is sufficient to accommodate the projected number of future surgeries.

---

[1] An ASF is defined in WAC 246-310-010(5) as "any free-standing entity, including an ambulatory surgery center that operates primarily for the purpose of performing surgical procedures to treat patients not requiring hospitalization."

¶4 Facilities in the offices of private physicians or dentists, whether for individual or group practice, are exempt from the definition of an ASF if the privilege of using the facility is not extended to physicians or dentists outside the individual or group practice. WAC 246-310-010(5). Historically, and in the instant case, the Department excludes exempt surgical facilities in calculating step one of the methodology—existing capacity. It does, however, include surgeries performed in the exempt facilities in calculating step two—projected future need.

¶5 In November 2002, Swedish applied for a CN to establish a new ASF in Bellevue, Washington. Overlake Hospital Association and Evergreen Healthcare each obtained "affected part[y]" status and submitted comments to the Department in opposition to Swedish's application. Clerk's Papers (CP) at 219. Using the methodology described above, the Department determined that there was need in East King County for an additional ASF with 5.39 outpatient operating rooms. Accordingly, it issued a CN to Swedish to build a five-room ASF in Bellevue.

¶6 Overlake and Evergreen requested an adjudicative proceeding before a health law judge to determine whether the Department erred by issuing the CN to Swedish. They contended that the Department failed to properly apply WAC 246-310-270(9) and that as a result of the alleged error, the need for an additional ASF in East King County was overstated. In upholding the Department's decision, the health law judge acknowledged that in calculating existing capacity and future need, the applicable language in sections (a) and (b) of WAC 246-310-270(9) "appears to be all inclusive" of ASFs and exempt facilities. CP at 29. The health law judge went on to say, however, that the language of the WAC "cannot be read in isolation" and that its "plain meaning may be ascertained by an examination of the statute in which the provision is found, as well as related statutes or other provisions of the same act in which the provision is found." *Id.* (citing *City of Olympia v. Drebick,*

156 Wn.2d 289, 295, 126 P.3d 802 (2006)). Following that approach, the health law judge determined that exempt facilities should be excluded from the calculation of existing capacity under WAC 246-310-270(9)(a), but included in the calculation of future need under subsection (b) of that regulation. In holding that Swedish established need for an additional five operating room ASF in Bellevue, the health law judge took particular note of the legislature's emphasis on assuring "that *all citizens* have accessible health services" and indicated that "[i]f the more inclusive approach were followed, the calculation of available operating rooms would include [exempt facilities] that would not be available to many of the individuals within the health planning area." CP at 29 (emphasis added).[2]

¶7 Overlake and Evergreen appealed the health law judge's decision to King County Superior Court, which upheld the health law judge. The decision of the superior court was then reviewed by the Court of Appeals, which reversed the superior court, holding that "the Department's decision to issue Swedish the CN was arbitrary and capricious because it was based on an erroneous interpretation of the governing statutes and a misapplication of its own regulations." *Overlake Hosp. Ass'n v. Dep't of Health*, 148 Wn. App. 1, 7, 200 P.3d 248 (2008). We granted the petition of Swedish and the Department to review the Court of Appeals' decision. *Overlake Hosp. Ass'n v. Dep't of Health*, 166 Wn.2d 1010, 210 P.3d 1018 (2009).

## II

¶8 The standard of review in CN cases is that the agency decision is presumed correct and that the challeng-

---

[2] The health law judge's findings of fact and conclusions of law are somewhat unclear, but the parties and the Court of Appeals all agreed that the health law judge concluded, as set forth above, that exempt facilities should be excluded in the existing capacity calculation but that surgeries expected to be performed in those facilities should be included in the future need calculation. *See* CP at 13-30; Pet'r Wash. State Dep't of Health's Suppl. Br. at 7, 9; Suppl. Br. of Swedish Health Servs. at 11; Resp'ts' Suppl. Br. at 2; *Overlake Hosp. Ass'n v. Dep't of Health*, 148 Wn. App. 1, 3, 200 P.3d 248 (2008), *review granted*, 166 Wn.2d 1010, 210 P.3d 1018 (2009).

ers have the burden of overcoming that presumption. *Univ. of Wash. Med. Ctr. v. Dep't of Health*, 164 Wn.2d 95, 102, 187 P.3d 243 (2008). Insofar as questions of law are concerned, we may substitute our interpretation of the law for that of the agency. We do, however, accord substantial deference to the agency's interpretation of law in matters involving the agency's special knowledge and expertise. An agency's decision is arbitrary and capricious if the decision is the result of willful and unreasoning disregard of the facts and circumstances.

### III

¶9 The CN program was created as part of Washington's health planning strategy to "promote, maintain, and assure the health of all citizens in the state, provide accessible health services, health manpower, health facilities, and other resources while controlling increases in costs, and recognize prevention as a high priority in health programs." RCW 70.38.015(1). Pursuant to RCW 70.38.105(1), the Department is authorized to administer the CN program. The Department's secretary is authorized to promulgate rules setting up the process for obtaining a CN. RCW 70.38.135(3). In determining whether to issue a CN for a new health care facility, the Department is to consider the following factors: (1) need, (2) financial feasibility, (3) structure and process of care, and (4) cost containment. WAC 246-310-210 through -240. Factors two, three, and four have not been at issue in this case. Rather, the focus has been on factor one—whether the Department used the proper methodology for calculating need.

¶10 More specifically, the question before us is whether the Department erred in the manner in which it factored exempt facilities in its calculation of existing capacity and future need as a prelude to determining net need under the aforementioned three-step process set forth in WAC 246-310-270(9). Under WAC 246-310-270(9)(a), to determine existing capacity, the Department is to

[a]ssume the annual capacity of one operating room located in a hospital and not dedicated to outpatient surgery is ninety-four thousand two hundred fifty minutes. . . .

. . . Assume the annual capacity of one operating room dedicated to ambulatory surgery is sixty-eight thousand eight hundred fifty minutes. . . . [A]ssume fifty minutes per outpatient surgery . . . .

. . . Calculate the total annual capacity (in number of surgeries) of all dedicated outpatient operating rooms in the area.

. . . Calculate the total annual capacity (in number of minutes) of the remaining inpatient and outpatient operating rooms in the area.

WAC 246-310-270(9)(a). For future need, it must

[p]roject number of inpatient and outpatient surgeries performed within the hospital planning area for the third year of operation. This shall be based on the current number of surgeries adjusted for forecasted growth in the population served and may be adjusted for trends in surgeries per capita. . . .

. . . Subtract the capacity of dedicated outpatient operating rooms from the forecasted number of outpatient surgeries. . . .

. . . Determine the average time per inpatient and outpatient surgery in the planning area. . . .

. . . Calculate the sum of inpatient and remaining outpatient . . . operating room time needed in the third year of operation.

WAC 246-310-270(9)(b). Net need, the ultimate question for the Department, is determined by calculating the difference, if any, between existing capacity and future need. *See* WAC 246-310-270(9)(c).

¶11 In analyzing whether exempt facilities should be included in the existing capacity and future need calculations, we must first look to the regulatory language in WAC 246-310-270(9)(a) pursuant to the rules of statutory construction. *See City of Seattle v. Allison*, 148 Wn.2d 75, 81, 59 P.3d 85 (2002) ("Rules of statutory construction apply to

administrative rules and regulations." (citing *State v. Burke*, 92 Wn.2d 474, 478, 598 P.2d 395 (1979))). If the meaning of a rule is plain and unambiguous on its face, then we are to give effect to that plain meaning. *Id.* (citing *State v. J.M.*, 144 Wn.2d 472, 480, 28 P.3d 720 (2001)). An ambiguity exists, however, if there is "more than one reasonable interpretation" of the regulation. *Columbia Physical Therapy, Inc. v. Benton Franklin Orthopedic Assocs.*, 168 Wn.2d 421, 433, 228 P.3d 1260 (2010). If a regulation is deemed ambiguous, we may resort to statutory construction, legislative history, and relevant case law in order to resolve the ambiguity. "A term in a regulation should not be read in isolation but rather within the context of the regulatory and statutory scheme as a whole." *Allison*, 148 Wn.2d at 81 (citing *ITT Rayonier, Inc. v. Dalman*, 122 Wn.2d 801, 807, 863 P.2d 64 (1993)). We should not construe a regulation in a manner that is strained or leads to absurd results. Our paramount concern is to ensure that the regulation is interpreted in a manner that is consistent with the underlying policy of the statute. *Safeco Ins. Cos. v. Meyering*, 102 Wn.2d 385, 392, 687 P.2d 195 (1984).

¶12 As we have observed above, the Court of Appeals concluded that the Department acted arbitrarily and capriciously by employing the methodology it did for calculating net need, i.e., excluding exempt facilities in calculating existing capacity, while at the same time including surgeries performed at those facilities in calculating future need. *See Overlake*, 148 Wn. App. at 5 (stating that "the formula either undercounts the number of surgeries in the first step or over-counts the number of surgeries to be performed in the second step"). The Court of Appeals determined that the Department's use of this flawed methodology resulted in its "over-calculation of future need for additional outpatient operating rooms in the East King County [p]lanning [a]rea." *Id.* at 7.

¶13 Swedish and the Department assert here that the Court of Appeals failed to accord sufficient deference to the Department's interpretation of its own regulation. The

Department contends that it properly excluded operating rooms in exempt facilities when it made its determination of existing capacity because WAC 246-310-270(9)(a) relates to determining the need for additional ASFs and operating rooms in exempt facilities are not included in the definition of an ASF. In that regard, they point to WAC 246-310--010(5), which indicates that all ASFs are freestanding entities that operate primarily for outpatient surgical procedures. The Department and Swedish go on to contend, however, that surgeries performed in exempt facilities should be included in the calculation of future need under WAC 246-310-270(9)(b) because the Department's policy, consistent with the aforementioned legislative policy declaration, is that an adequate supply of outpatient operating rooms should be generally available to support the number of surgeries that are projected for the future.

¶14 Overlake and Evergreen respond that the Court of Appeals' decision should be upheld because, in their view, that court "*corrected* an erroneous interpretation of the law" by applying the methodology in a way that is consistent with applicable statutes. Resp'ts' Suppl. Br. at 3. In that regard, they assert that the Court of Appeals' decision realigns "the application of the [m]ethodology with the legislature's policy goals" to prevent "overcapacity of health care facilities [that] tends to further drive up health care costs." *Id.* (citing *St. Joseph Hosp. & Health Care Ctr. v. Dep't of Health*, 125 Wn.2d 733, 735, 887 P.2d 891 (1995)).

¶15 Although it is not entirely clear from a reading of the health law judge's decision, it seems apparent that he concluded that when WAC 246-310-270(9) is read in light of RCW 70.38.015(1), it means that exempt facilities are to be excluded in the determination of existing capacity but included in the future need calculation. *See* CP at 29. While we are not convinced that the meaning of the regulation is as clear as the health law judge believed it to be, we do agree that subsections (a) and (b) of WAC 246-310-270(9) could be viewed as Swedish and the Department suggest. Their contention is that existing capacity

includes only generally available operating rooms and, in that regard, WAC 246-310-270(9)(a) must be read in connection with the definition of ASFs in WAC 246-310-010(5), which excludes exempt facilities from that definition. In support of their argument, Swedish and the Department explain that WAC 246-310-270(9)(a)(ii) sets forth annual capacity assumptions per outpatient operating room that are impractical for many exempt facilities—likely the offices of individual private physicians and dentists. In that regard, Swedish calls our attention to the regulation's assumption that 1,377 outpatient surgeries will be performed in each operating room each year,[3] and points out that "[i]t would be a very busy physician indeed who could perform 3.8 surgeries per day, 7 days per week, herself, in the operating room in her own office." Suppl. Br. of Swedish Health Servs. at 14 n.3. Swedish and the Department assert that the future need calculation, unlike the existing capacity calculation that is based on operating rooms, should be based on all surgeries in the geographic area, regardless of the type of facility in which those surgeries will be performed. In sum, it is plausible that the regulatory language does not require that exempt facilities be treated identically in both sections.

¶16 Overlake and Evergreen, on the other hand, set forth a reasonable interpretation of the regulation, contending that "the [m]ethodology is a defined series of mathematical calculations, which are described by a series of terms that can and should be used consistently throughout the [m]ethodology." Resp'ts' Suppl. Br. at 11 (footnote omitted). Specifically, they point out that the terms "operating rooms" and "surgeries" both appear in WAC 246-310--270(9)(a) and (b) and that those terms should be applied in the same manner to either include or exclude exempt facilities in calculating existing capacity and future need. See Resp'ts' Suppl. Br. at 12; Resp'ts' Answer to Proliance's

---

[3] Swedish arrives at this number by calculating the assumed annual capacity of one outpatient operating room (68,850 minutes) divided by the assumed amount of time per surgery (50 minutes). See WAC 246-310-270(9)(a)(ii). Swedish divides the result of that calculation (1,377 minutes) by the number of days in a year (365) to arrive at 3.8 surgeries per day.

Amicus Br. at 5. As counsel for Evergreen stated at oral argument before this court, it makes sense to compare "apples and apples" rather than "apples and oranges."[4]

¶17 The fact that the pertinent regulation can be interpreted in a way that is consistent with the Department's view of it, and also with that of Overlake and Evergreen, leaves us to conclude that WAC 246-310-270(9) is ambiguous. Faced with the ambiguity and our need to resolve the dispute, our paramount concern is to ensure that the regulation is interpreted consistently with the underlying legislative policy of the statute. *See Safeco*, 102 Wn.2d at 392.

¶18 We are satisfied that the public policy rationale behind the CN program, which convinced the health law judge that the regulation meant that exempt facilities should be excluded from existing capacity but included in future need, resolves the ambiguity. As noted above, the legislature has made clear its intent to "promote, maintain, and assure the health of all citizens in the state, provide accessible health services, health manpower, [and] health facilities." RCW 70.38.015(1). That, in our judgment, is the overriding purpose of the CN program. While we agree with Overlake and Evergreen that controlling the costs of medical care and promoting prevention are also priorities, we believe that these goals are of secondary significance because, to a large extent, they would be realized by promotion and maintenance of access to health care services for all citizens.

¶19 Furthermore, it is apparent that the Department did not ignore the state legislative goal of controlling costs, *see* Resp'ts' Suppl. Br. at 12, when it reviewed Swedish's CN application and determined that Swedish "met the cost containment criteria in WAC 246-310-240." CP at 232. We believe that the health law judge correctly concluded that

---

[4] *See* Wash. Supreme Court oral argument, *Overlake Hosp. Ass'n v. Dep't of Health*, No. 82728-1 (May 20, 2010) at 52 min., 40 sec., *audio recording by TVW*, Washington State's Public Affairs Network, *available at* http://www.tvw.org.

the project would not result in an unreasonable impact on costs for health services within the planning area.

¶20 In sum, we are satisfied that the Department's interpretation of the regulation is consistent with the goal of assuring a sufficient supply of publicly available ASF's, in that the approach "does not rely on unregulated exempt [facilities] to meet any part of the public demand for the service." Pet'r Wash. State Dep't of Health's Suppl. Br. at 10-11. The Department's reasoning, we believe, was well described by a Department analyst, Randall Hayek, at the hearing before the health law judge as follows:

> that operating rooms that are approved by certificate of need or are included in community hospitals are . . . available to the general surgical public if they are properly credentialed to use those rooms for the treatment of their patients, whoever their patients may be.
>
> The facilities that are described as exempt facilities, the use of those facilities is limited only to members of those group practices. And very frequently, we see that the use of these facilities is limited to one, sometimes two, different specialties of medicine, such as ENT [ear, nose, and throat] surgery or oral surgery or something like that. So those operating rooms are not really analogous to a generally available ambulatory surgery center, operating room, where a multitude of various services could be performed by a number of different physicians . . . .
>
> Q. So are you attempting to make sure that the number of surgeries can be met by the facilities that are open and generally available to everyone?
>
> A. Right. That's exactly what we're attempting to do.

CP at 334-35.

¶21 Because this court must accord the Department's interpretation of the ambiguous regulatory language great deference, as the agency has expertise and insight gained from administering the regulation that the reviewing court does not possess, we conclude that the Department properly considered the competing policy rationales when it applied the factors set forth in WAC 246-310-270(9) and that its

decision was not arbitrary or capricious. We, therefore, reverse the Court of Appeals and affirm the Department's decision to issue the CN to Swedish.

MADSEN, C.J., and C. JOHNSON, SANDERS, CHAMBERS, OWENS, FAIRHURST, J.M. JOHNSON, and STEPHENS, JJ., concur.