2016 JUL -5 AM 9: 13



# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

PROVIDENCE HEALTH & SERVICES –
WASHINGTON, d/b/a PROVIDENCE
REGIONAL MEDICAL CENTER
EVERETT, and d/b/a PROVIDENCE
SACRED HEART MEDICAL CENTER;
and SWEDISH HEALTH SERVICES, d/b/a
SWEDISH MEDICAL CENTER/FIRST
HILL,

        Appellants,

        v.

DEPARTMENT OF HEALTH OF THE
STATE OF WASHINGTON,

        Respondent,

UNIVERSITY OF WASHINGTON
MEDICAL CENTER,

        Intervenor.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 73454-7-I

DIVISION ONE

PUBLISHED OPINION

FILED: July 5, 2016

APPELWICK, J. — UWMC applied for a certificate of need to add 79 acute care beds to its Seattle facility. The traditional numeric methodology did not demonstrate need. However, the Department's certificate of need program approved the application. The HLJ upheld this approval, reasoning that an alternative methodology, Criterion 2, showed a need for additional beds. This

appeal challenges the review officer's subsequent decision that it was proper to utilize Criterion 2 and that it was properly applied. We affirm.

BACKGROUND

The State Health Planning and Resources Development Act, chapter 70.38 RCW, regulates the number of healthcare providers in the market. Univ. of Wash. Med. Ctr. v. Dep't of Health, 164 Wn.2d 95, 99, 187 P.3d 243 (2008). Under this statutory scheme, providers may open certain healthcare facilities and programs only when the Washington State Department of Health (Department) issues a certificate of need (CN). Id. at 99-100. The CN program is intended to promote accessible health services while controlling costs. RCW 70.38.015.

When considering a CN application, the Department analyzes the need for the proposed project, the financial feasibility of the project, structure and process of care, and cost containment. WAC 246-310-210 (need); WAC 246-310-220 (financial feasibility); WAC 246-310-230 (structure and process of care); WAC 246-310-240 (cost containment).

FACTS

The University of Washington Medical Center (UWMC) is a tertiary and quaternary care[1] hospital located in Seattle. It is also the teaching hospital for the University of Washington (UW) School of Medicine. UWMC is part of the UW Medicine health system. This system also includes Harborview Medical Center, Northwest Hospital & Medical Center, Valley Medical Center, the UW School of

---

[1] "Tertiary care" is a level of medical care available only in larger medical institutions, involving specialized techniques and equipment. "Quaternary care" is an advanced level of tertiary care.

Medicine, UW Physicians, UW Neighborhood Clinics, and Airlift Northwest. UWMC is currently licensed for 450 beds, 360 of which are used for acute care.

In 2005, UWMC began planning to build a new patient care tower. The UW Board of Regents approved the Montlake Tower in 2007, and construction was complete in 2012. The last three stories of the eight story tower were shelled in for future expansion, but unfinished.

In November 2012, UWMC applied for a CN to add 79 additional acute care beds in the Montlake Tower. Its original estimated capital expenditure was $70,771,363. This amount was estimated to be the cost of completing the three floors that had already been shelled in for future expansion.

Over the next year, the Department thoroughly assessed UWMC's application. It requested supplemental information from UWMC. It held a public hearing on UWMC's application. And, it collected written statements from interested parties.

Robert Russell was the CN program analyst leading the evaluation. Russell applied the numeric methodology that the Department traditionally uses to calculate need for acute care beds. This methodology revealed that there was not enough projected need in the planning area to support UWMC's request for 79 additional beds. Because need is an integral CN requirement, Russell drafted an evaluation that denied UWMC's CN application.

Then, Bart Eggen, executive director of the office that manages the CN program, reviewed Russell's draft evaluation. Eggen did not look at UWMC's CN application. He did not review UWMC's responses to the Department's requests

for supplemental information. He did not review any of the public comments submitted in connection with UWMC's application. He did not review the financial analyst's memo to Russell concerning the costs of UWMC's proposed project. Instead, after reviewing only Russell's draft evaluation, Eggen ordered Russell to rewrite the evaluation, find that the need requirement was met, and grant UWMC the CN.

Russell complied. He revised the draft evaluation to conclude that while the numeric methodology did not show enough need to justify UWMC's project, the methodology inaccurately allocated bed need in the planning area. The evaluation did not cite other approaches to calculate bed need. Yet, due to Eggen's instructions, the Department found that UWMC's project met all of the CN criteria, including need. The Department issued the CN to UWMC.

Several of UWMC's competitors—Providence Health and Services, doing business as Providence Sacred Heart Medical Center and Providence Regional Medical Center Everett, and Swedish Health Services, doing business as Swedish Medical Center/First Hill (collectively "Providence")—opposed UWMC's application during the public comment period. In its written statements opposing the CN, Providence urged the Department to correctly apply the numeric methodology and find that UWMC's project did not satisfy the need requirement. Then, after the Department departed from this methodology in order to award the CN to UWMC, Providence again insisted that the Department should follow its own rules. It requested an adjudicative hearing to contest the CN. After requesting the hearing, Providence deposed Russell and Eggen. These depositions informed

Providence of the Department's initial review of UWMC's application and Eggen's direction to grant the CN.[2]

The adjudicative hearing was held in June 2014 before Health Law Judge Frank Lockhart. Both UWMC, as intervenor, and Providence called witnesses and presented exhibits. The HLJ used "Criterion 2" of the hospital bed need forecasting method contained in the Washington "State Health Plan" to determine that there was a need for the additional beds. See former RCW 70.38.919 (1989), repealed by LAWS OF 2007, ch. 259, § 67. He did so rather than relying on the traditional numeric methodology that is also found in the State Health Plan. The numeric methodology provides a formula to calculate bed need in the planning area, whereas Criterion 2 looks at whether other circumstances—such as accessibility to underserved groups, expansion of programs with better results, and promotion of training programs—indicate a need for additional beds. The HLJ relied on Criterion 2 because he believed that the numeric methodology did not accurately capture the need for additional acute care beds. The HLJ concluded that UWMC's project satisfied all of the CN requirements. On September 12, 2014, the HLJ entered findings of fact, conclusions of law, and an initial order approving UWMC's CN to add 79 acute care beds.

---

[2] The discovery of Eggen's role in the Department's evaluation likely energized an otherwise routine competitor dispute over bed allocation.

Providence sought administrative review of the HLJ's initial order. On January 26, 2015, the review officer adopted the findings of fact and conclusions of law from the initial order. And, the review officer entered a final order that affirmed the initial order.

Providence filed a petition for judicial review in King County Superior Court. The parties jointly requested an order certifying the petition for judicial review to this court. The trial court certified the matter to this court. The parties jointly filed a motion for discretionary review to this court. This court granted the motion.

## DISCUSSION

The Washington Administrative Procedure Act (WAPA), chapter 34.05 RCW, governs this court's review of administrative actions. King County Pub. Hosp. Dist. No. 2 v. Dep't of Health, 178 Wn.2d 363, 371-72, 309 P.3d 416 (2013); RCW 34.05.570. We sit in the same position as the superior court, applying WAPA to the record before the agency. DaVita, Inc. v. Dep't of Health, 137 Wn. App. 174, 180, 151 P.3d 1095 (2007). The agency decision is presumed to be correct, and the challenger bears the burden of proof. RCW 34.05.570(1)(a); Overlake Hosp. Ass'n v. Dep't of Health, 170 Wn.2d 43, 49-50, 239 P.3d 1095 (2010).

Under WAPA, this court may grant relief only in limited circumstances. DaVita, 137 Wn. App. at 181. We may grant relief when the agency followed an unlawful procedure, erroneously interpreted or applied the law, or entered an order that is not supported by substantial evidence. RCW 34.95.570(3)(c), (d), (e). We review an agency's factual findings to determine whether they are supported by substantial evidence sufficient to persuade a fair-minded person of the stated

6

premise. DaVita, 137 Wn. App. at 181. This court overturns the agency's factual findings only if they are clearly erroneous, meaning that the entire record leaves us with the firm and definite conviction that a mistake was made. Univ. of Wash. Med. Ctr., 164 Wn.2d at 102. Under the error of law standard, this court may substitute its interpretation of the law for that of the agency, but the agency's interpretation is accorded substantial deference, particularly where the agency has special knowledge and expertise. Id. This court may also grant relief from an agency order that is arbitrary and capricious, meaning that it is the result of willful and unreasoning disregard of the facts and circumstances. RCW 34.05.570(3)(i); Overlake, 170 Wn.2d at 50.

Although Providence articulates strong concern over the Department's evaluation of UWMC's application, we do not review Eggen's or Russell's actions directly. Their decisions received an adjudicative hearing before the HLJ. And, when the HLJ affirmed the decision of the Department, a review officer then reviewed the matter and entered a final order upholding the CN. We review the correctness of this final administrative decision. DaVita, 137 Wn. App. at 181 (noting that this court reviews the Department's final order pertaining to a CN application).

I.   Utilization of Criterion 2 to Determine Need

Providence argues that the HLJ's reliance on Criterion 2 was an unprecedented departure from the Department's consistent use of the numeric methodology. Providence asserts that the regulatory scheme does not allow the Department to use Criterion 2 to assess bed need. And, it contends that the

Department disclosed its reliance on Criterion 2 too late for Providence to participate meaningfully in the public comment process. As a result, Providence argues that the decision to use Criterion 2 of the State Health Plan to assess need for UWMC's proposal was an error of law, arbitrary and capricious, and unsupported by substantial evidence.[3]

Criterion 2 of the State Health Plan states,

2. CRITERION: Need for Multiple Criteria

Hospital bed need forecasts are only one aspect of planning hospital services for specific groups of people. Bed need forecasts by themselves should not be the only criterion used to decide whether a specific group of people or a specific institution should develop additional beds, services, or facilities. Even where the total bed supply serving a group of people or a planning area is adequate, it may be appropriate to allow an individual institution to expand.

STANDARDS:

. . . .

b. Under certain conditions, institutions may be allowed to expand even though the bed need forecasts indicate that there are underutilized facilities in the area. The conditions might include the following:

- the proposed development would significantly improve the accessibility or acceptability of services for underserved groups; or

- the proposed development would allow expansion or maintenance of an institution which has staff who have greater training or skill, or which has a wider range of important services, or whose programs have evidence of better results than do neighboring and comparable institutions; or

_____

[3] Providence assigns error to findings of fact 1.6, 1.7, 1.11, and 1.12, which contain the HLJ's Criterion 2 analysis.

- the proposed development would allow expansion of a crowded institution which has good cost, efficiency, or productivity measures of its performance while underutilized services are located in neighboring and comparable institutions with higher costs, less efficient operations or lower productivity.

In such cases, the benefits of expansion are judged to outweigh the potential costs of possible additional surplus.

Neither RCW 70.38.115 nor WAC 246-310-210 provide an exclusive, finite approach for determining a population's need for hospital beds. RCW 70.38.115(2) provides only that the Department must consider "[t]he need that the population served or to be served by such services has for such services." And, WAC 246-310-210 lists several factors on which a determination of need shall be based. The first factor is whether "[t]he population served or to be served has need for the project and other services and facilities of the type proposed are not or will not be sufficiently available or accessible to meet that need."[4] WAC 246-310-210(1).

The Department has traditionally relied on a 12 step numeric methodology contained in the State Health Plan to calculate the need for hospital beds. The 12 step methodology provides a formula for forecasting the aggregate need for hospital beds in a particular planning area. Its steps are separated into three elements: develop trend information on hospital utilization, calculate baseline non-psychiatric bed need forecasts, and determine total baseline hospital bed need

---

[4] This lack of definite standards for determining acute care bed needs stands in contrast to several other situations in which a facility must apply for a CN. For example, WAC 246-310-284 provides a concrete methodology to determine need for kidney dialysis stations, WAC 246-310-290(7) states the steps used to project the need for hospice services, and WAC 246-310-360 contains guidelines for calculating need for nursing home beds.

forecasts.[5] The State Health Plan remained effective until June 30, 1990. See former RCW 70.38.919 (1989) (LAWS OF 1989, 1st Ex. Sess., ch. 9, § 610), repealed by LAWS OF 2007, ch. 259, § 67. But, the Department continues to use this methodology.

Providence argues that the Department's consistent use of the numeric methodology means that the Department may not use other standards to determine bed need. To support this contention, Providence relies on language from the Department's prior administrative decisions.[6] In In re Certificate of Need Decision on Providence Sacred Heart Medical Center & Children's Hospital Proposal to Add 152 Acute Care Beds to Spokane County, No. M2009-1141 at 14-15 (Dep't of Health Aug. 9, 2011) ("Sacred Heart"), the Department explained that it relies on the numeric methodology because there is no statutory or regulatory process to calculate bed need. It recognized that both the CN program and applicants have used this methodology, and "[t]he predictability afforded by the consistent use of the State Health Plan methodology argues for its continued use." Id. at 15. But, it also noted, "This does not prohibit an applicant from submitting an alternative approach to show need exists." Id. The Department used similar language in In re the Certificate of Need Decision on Valley Medical Center's, Auburn Regional Medical Center's, and Multicare Health System's Application for

---

[5] The numeric methodology uses population and healthcare use statistics on the statewide, health service area, and planning area level. The planning area involved here is the North King Planning area, which is comprised of select zip codes within King County.

[6] Although we are not bound by these decisions, we examine them to the extent they demonstrate the Department's prior bed need analyses.

Acute Care Beds in Southwest King County, No. M2011-253 (Dep't of Health Feb. 13, 2012) ("Valley"). The Valley decision also recognized the value in the consistent application of the methodology. Id. at 14. But, the Department acknowledged that, "[a]ny bed need methodology used should provide a predictable, transparent, and consistent process for applicants." Id. at 14 n.8. It clarified, "An applicant should know what is required to apply for a CN (transparency of process), how the program will apply the process (predictability of the process), and whether the program follows the process (consistency with the past process)." Id.

Neither of these cases requires that the Department apply only the 12 step methodology. Although the Department recognized the value of consistency and predictability, in both decisions it acknowledged the fact there may be other approaches to determine bed need. In Sacred Heart, the Department explicitly stated that applicants may submit alternative methods to show need. No. M2009-1141 at 15. And, Valley emphasized the importance of consistency and transparency in the CN review process—not that the 12 step methodology is the only means of determining bed need. No. M2011-253 at 14 n.8. Moreover, in neither case did the applicant request the Department to apply Criterion 2.

11

The recognition that there may be other methods of determining bed need is consistent with the statutory and regulatory scheme. WAC 246-310-200(2)(b), which outlines the criteria for a Department's review of a CN application, allows the Department to consider

> (i) Nationally recognized standards from professional organizations;
> (ii) Standards developed by professional organizations in Washington state;
> (iii) Federal [M]edicare and Medicaid certification requirements;
> (iv) State licensing requirements;
> (v) Applicable standards developed by other individuals, groups, or organizations with recognized expertise related to a proposed undertaking; and
> (vi) The written findings and recommendations of individuals, groups, or organizations with recognized expertise related to a proposed undertaking, with whom the department consults during the review of an application.

And, RCW 70.38.115(5) recognizes that "[c]riteria adopted for review in accordance with subsection (2) of this section may vary according to the purpose for which the particular review is being conducted or the type of health service reviewed."

Utilizing standards other than the numeric methodology is not inconsistent with the Department's previous CN evaluations. The Department has previously acknowledged,[7] "The methodology is a flexible tool, capable of delivering meaningful results for a variety of applications, dependent upon variables such as referral patterns, age-specific needs for services, and the preferences of the users of hospital services, among others." Sacred Heart CN Evaluation at 8. In its

_____

[7] The record contained a copy of the Department's evaluation of the CN in Sacred Heart (Sacred Heart CN Evaluation).

12

evaluation of Sacred Heart's proposal to add 152 acute care beds, the Department concluded that the methodology did not show a need for additional beds until well beyond the projection period. Id. at 16. But, the Department did not end its analysis there—it looked to whether there was evidence supporting Sacred Heart's claims of overcrowding, increased population growth within the community, and long waits before patients could be admitted. Id. Because it found that Sacred Heart had not demonstrated that there were no other facilities available to meet the need, and because the methodology did not indicate need, the Department found that the need criterion was not met. Id. at 17. Similarly, on reconsideration of Kennewick General Hospital's (KGH) application (KGH RCN) to add 34 beds, 30 of which would be acute care beds, the Department assessed external and internal factors affecting the need for additional beds at KGH, in addition to the numeric methodology. KGH RCN at 15. The Department concluded that even though the methodology did not show need for additional beds in the planning area until past the projection year, "patient utilization trends support a need for additional bed capacity at KGH, regardless of the number of beds already available in the planning area." Id.

Given the Department's previous history of relying on the numeric methodology but recognizing its limitations, we conclude that the Department's use of Criterion 2 here was not unprecedented, as Providence claims.

Providence contends that Criterion 2 of the State Health Plan is not a "standard" that WAC 246-310-200 allows the Department to consider. Instead, Providence characterizes Criterion 2 as legally ineffectual language from the State

Health Plan, which has been defunct for 25 years. But, if the fact that the State Health Plan no longer has any legal authority means that Criterion 2 is not a standard, then the 12 step methodology should not be considered a valid standard either. The methodology has not been enacted into law; rather, the Department has previously cited with approval to the State Health Plan when applying it. See Sacred Heart, No. M2009-1141 at 14; Valley, No. M2009-1141 at 14-15.

Criterion 2 recognizes that the numeric based methodology is not always the most effective means of evaluating bed need. It provides an alternative process through which the Department may assess bed need. Although the Department has not previously used Criterion 2, that alone does not preclude the Department from referring to it. Criterion 2 satisfies the language of WAC 246-310-200, as it is an applicable standard developed by a group with expertise in the field. And, by offering an alternative method of evaluating bed need, Criterion 2 is also in line with the purpose of the State Health Planning and Resources Development Act, which is to promote accessibility of health services. RCW 70.38.015.

Providence contends that even if Criterion 2 is a proper standard, the Department was required to disclose the standard before it evaluated UWMC's application. It cites to WAC 246-310-200(2)(c) in support of this proposition. That regulation provides,

> At the request of an applicant, the department shall identify the criteria and standards it will use prior to the submission and screening of a certificate of need application. . . . In the absence of an applicant's request under this subsection, the department shall

14

identify the criteria and standards it will use during the screening of a certificate of need application.

WAC 246-310-200(2)(c).

Providence argues that it was not able to contribute meaningfully in the public comment process because the Department did not disclose that it would rely on Criterion 2. But, Providence had notice from the beginning that the Department might consider factors other than the numeric methodology to determine need. In its CN application, UWMC analyzed need using both the numeric methodology and Criterion 2. In the application, UWMC asserted that the numeric methodology understates the need for acute care beds. Accordingly, UWMC encouraged the Department to look at Criterion 2 as an alternative need analysis. UWMC also referred to Criterion 2 in response to the Department's request for supplemental information. Therefore, Providence had notice that the Department might consider Criterion 2 in evaluating UWMC's application.

The public comment period was not the only opportunity to challenge Criterion 2. When the Department issued its decision, Providence had no trouble determining that the numeric methodology would not support the decision. Given that UWMC had sought reliance on Criterion 2, Providence reasonably should have anticipated that was the basis for the Department's decision. Providence had an opportunity for discovery and for a hearing. It does not identify how it was unable to adequately challenge the use of the Criterion 2 methodology.

We conclude that it was not legal error to use Criterion 2 as a standard to assess bed need. And, findings of fact 1.6, 1.7, 1.11, and 1.12 relating to WAC 246-310-220 are not clearly erroneous.

II.   Application of Criterion 2

Providence asserts that, even applying Criterion 2, the record does not support a finding of need for UWMC's project. It argues that the record does not contain the comparative data that Criterion 2 requires on factors such as greater training and skill, a wider range of important services, and programs with evidence of better results. And, Providence contends that the findings of fact concerning Criterion 2 are arbitrary and capricious and unsupported by substantial evidence.

The HLJ found that all three of the Criterion 2 standards were met in this case: UWMC's project would improve the accessibility of services for underserved groups; allow expansion of an institution with a wider range of services, programs with better results, and staff with greater training or skill; and facilitate expansion of a crowded institution with good cost, efficiency, or productivity. In support of this, the HLJ made several factual findings: 89 percent of UWMC's patient days come from outside the North King planning area; UWMC provides a higher percentage of care for tertiary and quaternary areas including cardiology, high risk pregnancy, oncology, and organ transplants than other providers in the state; 10 percent of UWMC's patient days come from persons who live outside the state; the population in the Washington, Wyoming, Alaska, Montana, and Idaho (WWAMI) region is projected to grow 11 percent over the next decade; UWMC is at maximum effective capacity; many patients with complex medical needs in Washington and the WWAMI region will not have other treatment options available; UWMC provides the highest percentage of inpatient care to Medicaid recipients out of any King County hospital except its affiliated hospital, Harborview; and

UWMC also provides training to physicians as the WWAMI region's only teaching hospital.[8]

Here, there is evidence in the record supporting the finding that UWMC's project would improve the accessibility of services for underserved groups. The evidence shows that, compared to other hospitals in the North King County planning area, UWMC provides an above average percentage of charity care, meaning care to patients with little to no ability to pay for health care. In 2011, the UW Medicine system provided more than $300 million in uncompensated care. During that time frame, UWMC provided 23 percent of its care to Medicaid patients, and 7.5 percent to self-pay patients. This was at the high end of the range for providers in King County. There is also evidence in the record that many of the patients who are transferred to UWMC from other hospitals for complex care are uninsured or receiving Medicaid—including patients that are transferred from Providence's hospitals.

The record also supports the finding that UWMC's project would allow the expansion or maintenance of an institution with staff possessing greater training or skill, or a wider range of important services, or programs with evidence of better results than neighboring and comparable institutions. The record shows that UWMC has received numerous awards recognizing the quality of its acute care services. Since the *U.S. News & World Report* began ranking hospitals in 1990, UWMC has made its honor roll. And, in the latest rankings UWMC was ranked the number one hospital in Washington. UWMC's organ transplant programs have

---

[8] Finding of fact 1.8.

been nationally recognized. In 2010, UWMC received two silver awards from the Health Resources and Services Administration for outstanding transplant care in its kidney and liver transplant programs. It also received a bronze award for its kidney/pancreas transplant program. In 2012, UWMC received bronze awards for its heart, kidney, and liver transplant programs. UWMC's organ transplant programs have also been recognized by the Blue Cross and Blue Shield Association. In 2013, UWMC was awarded a Blue Distinction for its positive outcomes in lung, liver, and pancreas/kidney transplant programs.

There is also evidence showing that UWMC serves complex patients from across the WWAMI region, not just within the planning area. Its cardiac surgery service has the highest volume of heart transplant and mechanical assist procedures in the state. In 2012, UWMC performed 20 heart transplants, placed 58 left ventricular assist devices and seven total artificial hearts, and put one patient on extracorporeal life support. Of the most recent 99 patients, 12.1 percent were from out-of-state. At the UWMC Regional Heart Center, which treats complex cardiac patients, about half of the patients reside outside of King County, and 7 or 8 percent reside out-of-state.

UWMC is also the training hospital for the only allopathic medical school in the WWAMI region. There are 1,318 residents and fellows in training at UWMC. The school's accreditation depends on its students handling a minimum volume of cases. In many instances, these cases must occur at a single clinical site. And, the UW School of Medicine is nationally recognized for its research—the greater university is ranked the top public research institution in the country. Evidence

supports the finding that additional beds would help UWMC train new physicians and meet its research goals, which would benefit the wider WWAMI region.

The record further shows that neighboring and comparable institutions do not provide the same level of care as UWMC. The other hospitals within the planning area are either specialized, like Seattle Cancer Care Alliance, which is limited only to oncology, or general community based hospitals, like Swedish's Ballard hospital or Northwest Hospital. These hospitals are not capable of providing the complex care that UWMC provides. And, there is evidence that UWMC treats a higher percentage of patients in select quaternary areas, particularly cardiology, oncology, and organ transplants, than other providers in the state. Although Providence argues that UWMC has inaccurately represented its share of complex cases,[9] it conceded in public comments and at the adjudicative hearing that UWMC's total share of complex cases is higher than other providers, and that UWMC provides more organ transplants and oncology care than other providers in the state.

And, the evidence shows that UWMC is currently operating near its maximum effective capacity. During 2011, the average midnight occupancy rate[10] for UWMC's acute care beds was 78 percent. The Department generally treats a

---

[9] Providence has continually argued that UWMC's data analysis misrepresents the percentage of its patients who receive complex care that is unavailable at other hospitals. It has contended that UWMC's comparison of cases and services is a "cherry-picked" group of complex cases, inflating UWMC's relative market share of these particularly complex cases. Providence asserts that when analyzing a complete group of complex cases in the state, UWMC's total share of the complex cases is only slightly higher than other providers.

[10] Midnight is the lowest census point of the day. The average midnight occupancy rate is also called the average daily census (ADC).

75 percent occupancy rate as the ideal point for the efficient provision of services—an occupancy rate above 75 percent begins to compromise access to health care and often justifies additional beds. When looking at only UWMC's ICU beds, the occupancy rate in 2012 was 84 percent for one unit and 92 percent for the other.

These high occupancy rates have resulted in UWMC having to turn away patients. The director of the UW Medicine Transfer Center testified that in 2011, UWMC had to deny transfers to around seven percent of patients because it had no available acute care beds. During the public comment period, numerous health care providers in the WWAMI region submitted letters explaining that patients who have needed to be transferred to the UWMC have been delayed in receiving treatment. And, they expressed concern that without additional acute care beds, UWMC would deny transfers to patients in need of specialized care.

And, the population UWMC serves—the WWAMI region—is expected to grow by over eleven percent in the next decade. Within that same population and time frame, the age range of 65 and over, a group that receives a disproportionate amount of acute inpatient hospital care, is projected to grow 36 percent.

It is not enough for Providence to show that there is some credible evidence to the contrary of the HLJ's findings. Univ. of Wash. Med. Ctr., 164 Wn.2d at 102. Instead, Providence must show that those findings were clearly erroneous—that the entire record leaves this court with the definite and firm conviction that the HLJ made a mistake. Id. We conclude that there is substantial evidence supporting findings of fact 1.8, 1.13, 1.14, and 1.15, which found that UWMC established need

under WAC 246-310-210. Therefore, we hold that the HLJ did not err in determining that UWMC met the need requirement.

### III. Building Costs

Providence argues that UWMC's project fails the financial feasibility and cost containment criteria, because UWMC omitted $34 million in building costs from the application. It argues that, because these costs were not included in UWMC's application, the Department has not analyzed the true costs of UWMC's project. As a result, Providence claims that the HLJ's decision that the financial feasibility and cost containment criteria were met is legally erroneous.

Both the financial feasibility and cost containment criteria touch on a project's costs. WAC 246-310-220 lists three criteria on which a determination of financial feasibility shall be based: (1) whether the immediate and long range capital and operating costs can be met, (2) the cost of the project, including construction costs, will probably not result in an unreasonable impact on the cost of health services, and (3) the project can be appropriately financed. WAC 246-310-240 also lists three criteria on which a determination of cost containment shall be based: (1) superior alternatives, in terms of cost, efficiency, or effectiveness, are not available or practicable,[11] (2) if a project involves construction, the costs, scope, and method of construction are reasonable and the project will not have an unreasonable impact on the costs to the public of providing health services, and (3) the project will involve appropriate improvements in the delivery of health services.

---

[11] See section V, infra.

In its CN application, UWMC stated that its estimated capital expenditure for the project was $70,771,363. It broke down its expenses into construction costs, fixed and moveable equipment, architect fees, consulting fees, taxes, financing, and CN fees. In reviewing the financial feasibility of the project, the Department relied on its own experience and expertise to determine if UWMC's pro forma income statements reasonably project that the proposal would meet its immediate and long range capital and operating costs by the end of the third year of operation. It noted that this project is part of a larger construction project, as the physical shell for the proposed beds was already constructed as part of the Montlake Tower project. After analyzing the cost of this project in relation to UWMC's assets, the Department concluded that the project would not adversely affect UWMC's financial health. The Department also concluded that the cost of the project would probably not result in an unreasonable impact on health care costs. And, it concluded that the project was appropriately financed. With regards to cost containment, the Department determined that based on its financial feasibility analysis, the criteria were met.

After the adjudicative hearing, the HLJ found that UWMC met the financial feasibility requirements, even though it did not include the $34 million that it spent to build the shell for the current project.[12] Responding to Providence's argument that this expense should have been included in the construction costs, the HLJ noted that UWMC was forthcoming about the relationship between the Montlake

---

[12] This decision is reflected in findings of fact 1.3, 1.4, 1.17, 1.18, 1.19, 1.20, 1.21, and 1.22.

22

Tower project and the current project. He found that UWMC disclosed or referenced the cost of the shell on three different occasions. First, in 2008, UWMC filed a request for a determination of non-reviewability with the Department in which it disclosed the cost of the shell. Second, in 2010, UWMC applied for a CN requesting approval for an expanded neonatal service, in which it included the expenses associated with the entire Montlake Tower project, including the shell. UWMC did not finance the shell—it paid for the shell in full using cash from UWMC's reserves. The shelled space then became an asset of UWMC, and its ownership has not diminished UWMC's ability to pay the capital and operating costs of the project. And, in UWMC's application for the CN at issue here, it stated that the physical shell for the proposed beds was already constructed as part of the Montlake Tower project. UWMC later clarified in response to the Department's questions, that it had already provided all of the expenses for the Montlake Tower project in the 2010 CN application.

From this, the HLJ concluded that it was not unreasonable for UWMC to assume that it did not have to include the shell costs in its capital expenditure budget for this project. Further, the HLJ pointed out that the crux of the financial feasibility requirement is the reasonableness of the financing, and including the shell costs in the capital expenditure costs would not have made the project unreasonably expensive.

Providence asserts that UWMC was legally required to include the shell costs, and the HLJ's contrary decision is legally erroneous. It cites to RCW 70.38.025(2) and WAC 246-310-010(10), both of which define capital expenditure.

23

Both definitions provide that a capital expenditure is an expenditure "which, under generally accepted accounting principles, is not properly chargeable as an expense of operation or maintenance." RCW 70.38.025(2); WAC 246-310-010(10). Providence claims that this definition indisputably establishes that all construction costs must be included in an applicant's capital expenditure estimate, and therefore UWMC's estimated capital expenditure was legally inaccurate. But, the shell was already paid for. No new construction of the shell was contemplated. No financing for shell construction was needed; no debt repayment was identified. Therefore, no negative impacts of construction costs or financing of the shell existed nor needed to be evaluated under WAC 246-310-220 and 240.

We conclude that findings of fact 1.17, 1.18, 1.19, 1.20, 1.21, 1.22, 1.30, 1.31, and 1.32 are not clearly erroneous. Therefore, the conclusion that UWMC's application satisfied the financial feasibility and cost containment criteria was not legally erroneous or arbitrary and capricious.

IV.    Superior Alternatives

Providence also argues that UWMC has not met the superior alternative prong of the cost containment requirement. Providence alleges that a superior alternative to this project would be to transfer less complex services from UWMC to its affiliated hospital, Northwest.

As discussed above, WAC 246-310-240 contains three criteria that must be assessed to determine whether a proposed project will foster cost containment. One of these factors is if "[s]uperior alternatives, in terms of cost, efficiency, or effectiveness, are not available or practicable." WAC 246-310-240(1).

24

But, the record supports the finding that Providence's proposed superior alternative would not be feasible. UWMC has already transferred less complex service lines to Northwest, including hip and knee replacement surgeries, hernia surgery, midwifery, and its multiple sclerosis center. And, UWMC considered shifting additional acute inpatient programs to Northwest as an alternative to the current proposal. But, it determined that this alternative would require significant investments—it would require the duplication of expensive equipment, as well as the need for additional staff with the specialized training and knowledge base of its UWMC staff. UWMC reasoned that because its staff largely support the entire hospital, rather than a single unit, transferring patient lines to Northwest would not eliminate staff or equipment from UWMC.

Northwest's director, Cynthia Hecker, testified that as a community-based facility, Northwest delivers secondary and low end tertiary care. As such, she explained that Northwest does not have the staffing expertise or equipment necessary to provide the high end care available at UWMC.

In arguing that shifting services to Northwest would be a superior alternative, Providence relies on a comparison of DRGs[13] to suggest that Northwest provides "virtually all of the services offered by UWMC." Providence points to the testimony of its expert, Dr. Frank Fox, who explained that he looked at the DRGs that occurred at both UWMC and Northwest and compared the lengths of stay for those DRGs. He concluded that when the DRGs and the lengths

---

[13] DRGs are Diagnostic Related Groups, which is a common system of labeling hospital cases.

of stay were the same, the care delivery in terms of resource consumption would be roughly the same. Dr. Fox's data showed that 91.5 percent of the DRG cases he analyzed are also observed at Northwest.

But, Providence did not produce any evidence to show that Northwest has the staff or equipment necessary to duplicate additional inpatient lines. Nor did it show that Northwest has the capacity to accommodate the transfer of additional patient lines. Hecker testified that Northwest currently has a 60 percent occupancy rate during any given 24 hour period, but it usually reaches 100 percent occupied during the middle of the week when patients come in for and recover from elective procedures. Jody Carona, the principal with Health Facilities Planning & Development, testified that if Northwest were to meet its target occupancy rate, its available ADC would be 15.8. She explained that this is the only room for growth available at Northwest. Yet, UWMC would have to relocate patient services lines amounting to an ADC of 50 by 2015-2016 in order to avoid the need for the proposed bed expansion. Thus, Northwest currently does not have the ability to take on additional patient lines from UWMC such that would make it the superior alternative here.

From this evidence, we hold that finding of fact 1.29, which found that UWMC satisfied the superior alternative requirement, was not clearly erroneous.

V.    Structure and Process of Care

Providence argues that UWMC has not met the structure and process of care requirement, because it has not shown that its project will not result in an unwarranted fragmentation of services. Providence asserts that, without a finding

26

of numeric need for additional beds, UWMC's project cannot meet the requirement that its project will not result in fragmentation of services. And, it contends that the HLJ's finding 1.25, that UWMC's project would not create a surplus of the type of beds that the beds will be used for, is unsupported by the record.[14]

WAC 246-310-230 sets out criteria for determining that a project fosters an acceptable or improved quality of health care. These criteria include that "[t]he proposed project will promote continuity in the provision of health care, not result in an unwarranted fragmentation of services, and have an appropriate relationship to the service area's existing health care system." WAC 246-310-230(4).

But, as discussed above, UWMC presented evidence that its tertiary and quaternary services are not available at other hospitals in the planning area.[15] Northwest Hospital does not have the equipment or staff to provide this level of care. Swedish's Ballard facility is also a community-based hospital that does not provide tertiary services. This evidence suggests that adding 79 acute care beds at UWMC would promote the continuity of health care, rather than result in fragmentation of services. Instead of duplicating services that are already available in the planning area, UWMC's project will fill an existing need.

Therefore, Providence has not shown that the HLJ erred in finding that UWMC's project will not cause an unwarranted fragmentation of services. We conclude that findings of fact 1.25 and 1.26 are not clearly erroneous.

---

[14] Providence also challenges finding of fact 1.26, which determined that UWMC's project satisfies WAC 246-310-330's structure and process of care requirement.

[15] See section III, supra.

27

VI.    2012 CHARS Data

Providence also asserts that the HLJ erroneously decided to exclude 2012 CHARS (Comprehensive Hospital Abstract Reporting System) data, the most current data available. And, Providence contends that it was materially prejudiced by this decision.

The HLJ decided that he would not consider 2012 CHARS data. But, he did not exclude the UWMC's annualized 2012 projections, instead deciding to treat them as having the same inherent flaws as any projection has. The HLJ determined that new data that comes in after the public comment period, too late for the parties to incorporate it into the application, or too late for the Department to integrate it into its evaluation should generally be excluded from the CN decision.

The review officer concluded that the HLJ's decision to exclude this data was supported by law and by the facts of this case. And, the review officer noted that while the 2012 CHARS data would have been more correct than the 2012 projections, it was not so different as to suggest a different outcome.

This court reviews the health law judge's evidentiary rulings for an abuse of discretion. Univ. of Wash. Med. Ctr., 164 Wn.2d at 104. The HLJ has discretion to decide to admit or not admit evidence that came into existence after the public comment period had closed. Id.

Here, the public comment period closed on May 15, 2013. Afterward, both UWMC and Providence submitted rebuttals to the public comments. The last round of rebuttals were due on July 11, 2013. UWMC did not receive the 2012

CHARS data until July 10, 2013. As such, this data was not available until after the close of the public comment period. Neither UWMC nor Providence included the 2012 CHARS data in any of their materials submitted to the Department. And, the Department did not utilize the 2012 CHARS data in evaluating UWMC's application. Based on these facts, the HLJ did not abuse his discretion by excluding 2012 CHARS data from his review.

Providence claims that the HLJ's decisions regarding 2012 CHARS data were prejudicial, because UWMC was permitted to use annualized 2012 data, which Providence would have been able to rebut if the HLJ admitted the 2012 CHARS data. However, the HLJ specifically stated that he was taking UWMC's annualized 2012 data as argumentative, rather than factual. He assured Providence that he would filter out information that is simply argument, and that he would view the projections as "less reliable." There is no evidence that the HLJ gave these projections more weight than was appropriate. Instead, the HLJ relied on the 2011 CHARS data and Providence's own concessions in making his findings on the most hotly contested issue, bed need. Providence has not shown that the annualized 2012 data affected the HLJ's decision.

We affirm.

WE CONCUR:

29